

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00014-CV

CARLILE BANCSHARES, INC. AND
WASHINGTON INVESTMENT
COMPANY

APPELLANTS

V.

WILLIAM L. ARMSTRONG, III, ROD
BRYANT, SHANE LOEFFLER, AND
JACK VILLINES

APPELLEES

AND

## NO. 02-14-00018-CV

PATRICK LYNCH AND DENNIS
MEIER

APPELLANTS

V.

CARLILE BANCSHARES, INC. AND
WASHINGTON INVESTMENT
COMPANY

APPELLEES

----------

### FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 342-264322-13

---------

# MEMORANDUM OPINION[1]

---------

In these interlocutory appeals, we are asked to decide whether forum-selection clauses contained in corporate merger documents are enforceable against nonsignatories to the merger documents and, if not, whether the trial court could exercise personal jurisdiction over the nonsignatories. We conclude, under the specific facts of this case, that the forum-selection clauses are not enforceable against the nonsignatories. However, we conclude that two of the nonsignatories had sufficient minimum contacts with Texas that exercising jurisdiction over them does not offend traditional notions of fair play and substantial justice. Accordingly, we affirm the trial court's special-appearance orders.

## I.  BACKGROUND

### A.  PROPOSED MERGER AND DUE DILIGENCE

Washington Investment Company (WIC) was a Colorado bank-holding company that owned all of the outstanding shares of Colorado Community Bank (the Bank). Jerry Bryant (J. Bryant) was the chairman and chief executive officer of WIC and the Bank. Patrick Lynch was the president of the Bank and was a member of WIC's and the Bank's boards of directors. Dennis Meier was the

---
[1]*See* Tex. R. App. P. 47.4.

executive vice president of the Bank and was a member of the boards of directors of WIC and the Bank. William L. Armstrong, III, Jack Villines, Rod Bryant, and Shane Leoffler (collectively, the remaining directors) were the remaining members of WIC's and the Bank's boards of directors.

In 2009, WIC's net income began to decrease significantly based on the decline in the values of the bank's real-estate holdings, which secured its commercial loans. Believing the Bank's recovery would be a slow process, WIC's board of directors hired St. Charles Capital, LLC (St. Charles)—a Colorado investment banking firm—to find a buyer for WIC and, thus, the Bank. On February 21, 2011, Wesley A. Brown, the managing director of St. Charles, acting at the behest of WIC's board of directors, contacted Tom C. Nichols who was Carlile Bancshares, Inc.'s chief executive officer and chairman of its board of directors. Carlile is a Texas corporation that buys or invests in community banks located in the southwestern United States. Carlile had not considered buying WIC or the Bank before Brown called.

Shortly thereafter, Carlile and WIC signed a nondisclosure agreement. Nichols signed the agreement on behalf of Carlile.[2] Carlile and WIC began preliminary due diligence, with "limited information" being exchanged. During this due-diligence period, J. Bryant, Lynch, and Meier compiled extensive financial information about WIC and the Bank, which Carlile requested, and forwarded it to

---

[2]The record does not reflect who signed the nondisclosure agreement on behalf of WIC.

3

Carlile in Texas. Further, multiple emails and phone calls were exchanged between Carlile representatives, J. Bryant, Lynch, and Meier. On May 16, 2011, Carlile issued a nonbinding letter of interest to WIC, which outlined the basic parameters under which Carlile would acquire all outstanding shares of WIC. Nichols signed the letter as chairman of the board and chief executive officer of Carlile, and J. Bryant signed and accepted the letter as president of WIC. In June or July 2011, Lynch and J. Bryant met with Nichols in Texas to discuss the possible merger of Carlile and WIC.[3] On September 26, 2011, Nichols met with J. Bryant at Carlile's office in Tarrant County, Texas, to discuss "the terms of the definitive agreement and other issues related to Carlile's acquisition of WIC."

## B. WIC APPROVAL, FORMAL AGREEMENTS, AND DIRECTOR RELEASES

On February 23, 2012, WIC's board of directors approved (1) a merger between WIC and Carlile, (2) J. Bryant to act as the representative of the shareholders of WIC, and (3) J. Bryant to finalize the transaction with Carlile. In spring 2012, Nichols met with J. Bryant and Lynch at Carlile's office in Tarrant County, Texas, "to discuss and negotiate" J. Bryant's noncompete agreement and Lynch's future employment agreement with Carlile.[4] On March 6, 2012, Carlile, WIC, and J. Bryant (as the representative of WIC's shareholders) signed an acquisition and reorganization agreement (the agreement), memorializing

---

[3]Nichols believed that this meeting occurred in May 2011.

[4]Lynch denied that this meeting occurred in Texas, and J. Bryant could not recall such a meeting.

their intent to merge Carlile and WIC into a new entity—Newco, a subsidiary of Carlile. The agreement contained a choice-of-law and forum-selection clause: "**GOVERNING LAW. THIS AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD FOR THE PROVISIONS THEREOF REGARDING CHOICE OF LAW. VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS AGREEMENT WILL LIE IN TARRANT COUNTY, TEXAS.**" The agreement also contained an indemnification clause that required Carlile to "indemnify, defend, and hold harmless each person entitled to indemnification from WIC or any WIC Subsidiary against all liabilities arising out of actions or omissions" arising from the agreement. J. Bryant signed the agreement on behalf of WIC and WIC's shareholders. The agreement was subject to shareholder approval.

WIC and Carlile then exchanged more "information relating to representations and warranties pertaining to WIC and its subsidiaries." This information led Carlile and WIC to sign an amended acquisition and reorganization agreement (amended agreement) on April 20, 2012, which itself was amended on November 16, 2012 (second amended agreement).[5] The

---

[5]Between the time of the amended and the second amended agreements, Nichols met with Armstrong at Carlile's offices in Tarrant County, Texas, to discuss the Bank's "financial condition and the need for it to be acquired and/or have a substantial injection of capital." Armstrong affirmed that he traveled to Texas for this meeting.

amended agreement contained the same choice-of-law and forum-selection clause that was included in the agreement. The second amended agreement did not contain the clause but provided that any provision in the amended agreement that was not specifically amended or deleted by the second amended agreement remained "in full force and effect." The second amended agreement did not mention any alteration or deletion of the clause. The amended agreement contained several covenants, obligations, representations, and warranties by WIC to Carlile. Further, the amended agreement required Carlile to indemnify J. Bryant, Meier, Lynch, and the remaining directors from "all liabilities arising out of actions or omissions" relating to the merger. The second amended agreement did not modify the indemnity provision or the covenants, obligations, representations, and warranties. Indeed, all remained in effect after the merger closed. Nichols on behalf of Carlile, and J. Bryant on behalf of WIC and its shareholders, signed the amended and second amended agreements.

The amended agreement required each member of WIC's board of directors to sign a release that released "WIC and the WIC Subsidiaries from any and all claims of such directors." It also provided for every officer and director to receive "a tail coverage policy" for one year after the merger was closed.[6] The second amended agreement did not modify the release requirement or the

---

[6]A tail policy provides ongoing insurance coverage for a company's officers and directors for claims made during the tail period that are based on acts or omissions of the officers or directors before closing. *E.g.*, Duncan, SEC Lit. Release No. 22274, 103 SEC Docket 614, 2012 WL 8703002 (Mar. 5, 2012).

6

provision of tail coverage.  Each release contained a choice-of-law and forum-selection clause:  "THIS AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS.  VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS AGREEMENT WILL LIE IN TARRANT COUNTY, TEXAS."  Lynch, Meier, J. Bryant, and the remaining directors each signed a release.

### C.  VOTING AGREEMENTS AND MERGER AGREEMENT

Because the merger was subject to shareholder approval, Lynch, Meier, J. Bryant, and the remaining directors signed a voting agreement shortly after the amended agreement was signed and voted their shares in favor of the merger.[7] The voting agreement contained a choice-of-law and forum-selection provision: "**THIS AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF COLORADO.  VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS AGREEMENT WILL LIE IN YUMA COUNTY, COLORADO.**"  J. Bryant, Meier, Lynch, and the remaining directors also signed support agreements as directors of WIC, in which they agreed "to refrain from harming the goodwill of WIC . . . or Carlile, and their respective customer and client relationships."  As did the voting agreement, the

---

[7] J. Bryant signed on behalf of WIC, as "Substitute Proxy Holder," and as an individual shareholder.  All other signatories signed as individual shareholders.

7

support agreement fixed Colorado as the governing law and the appropriate venue for "any cause of action arising from this agreement."

On December 27, 2012, the agreement and plan of merger (merger agreement) was finalized, which required Carlile—through Newco—to buy WIC's outstanding shares, Newco to merge into WIC, and WIC to become a subsidiary of Carlile. The merger agreement contained a choice-of-law and forum-selection clause: "<u>Governing Law</u>. **THIS MERGER AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS. VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS MERGER AGREEMENT WILL LIE IN TARRANT COUNTY, TEXAS.**" The merger agreement was signed by Nichols on behalf of Carlile and J. Bryant on behalf of WIC. The next day, J. Bryant, as authorized by WIC, signed and delivered to Carlile an "Officer's Certificate," certifying the accuracy of WIC's representations and warranties regarding the merger and the full performance of WIC's obligations, as set forth in the agreement, the amended agreement, and the second amended agreement. Nichols asserted that "[i]f not for the execution and delivery of the Officer's Certificate to Carlile in Texas, Carlile would not have purchased the outstanding WIC shares." Shortly after the merger was final, Lynch signed the previously-negotiated employment agreement with Carlile to serve as president of the Bank, which was then a subsidiary of Carlile. Lynch's employment agreement contained a choice-of-law

8

clause, mandating Colorado law as the law governing the employment agreement.

## D. PROCEDURAL FACTS

After the merger closed, Carlile believed that key pieces of information had been concealed during the due-diligence process, causing Carlile to overpay for the WIC stock. Carlile and WIC filed suit against J. Bryant, Lynch, Meier, and the remaining directors for common-law fraud, securities fraud, fraud in a stock transaction, negligent misrepresentation, and unjust enrichment. Along with money damages, Carlile and WIC pleaded for rescission and imposition of a constructive trust. In their petition, they contended two separate bases for the exercise of personal jurisdiction over Lynch, Meier, and the remaining directors: (1) Lynch, Meier, and the remaining directors consented to jurisdiction in Texas by virtue of the forum-selection clauses and (2) Lynch's, Meier's, and the remaining directors' minimum contacts with Texas conferred specific jurisdiction without offending the traditional notions of fair play or substantial justice. Shortly after Carlile and WIC filed suit, the remaining directors demanded that Carlile indemnify them against Carlile's claims based on the indemnification clause contained in the agreement.

J. Bryant, Meier, Lynch, and the remaining directors answered subject to their special appearances, in which they asserted that the trial court did not have personal jurisdiction over them based on a lack of minimum contacts with Texas. *See* Tex. R. Civ. P. 120a(1). The remaining directors submitted affidavits in

9

support of their special appearances in which they stated they did not live or conduct business in Texas; did not own or lease property or maintain bank accounts in Texas; did not sign contracts in Texas; did not sign the agreement, amended agreement, the second amended agreement, or the merger agreement; and did not pay taxes in Texas. Meier also submitted an affidavit in which he averred that he is not a resident of Texas; has never conducted any business in Texas; has no ongoing contact or relationship with any person or business in Texas; has no regular or systematic contact with any person or business in Texas; and has not traveled to Texas in the last ten years. Lynch made similar averments in his affidavit but admitted he "traveled to . . . Texas twice in the last ten . . . years. Once in 2005 to attend a sporting event and between late 2010 to mid-2011 to attend a gathering at the offices of Tom Nichols and Don Cosby," the president of Carlile.

In response to the special appearances, Nichols submitted an affidavit stating that Lynch traveled to Texas in May 2011 to discuss with Nichols and Cosby the Bank's business, the Bank's financial condition, Carlile's preliminary due-diligence findings, and the specifics of the proposed merger. During the drafting of the merger agreement, several conference calls occurred with Lynch and Meier calling Carlile in Texas. Several other calls regarding the acquisition were initiated by J. Bryant to Carlile in Texas, with Lynch and Meier participating. Further, Nichols averred that Lynch traveled to Texas to finalize his employment agreement with Carlile before the merger closed. Nichols also detailed specific

10

information that was not disclosed (either due to the concealment of information or the production of false information) during the due-diligence period.

Carlile and WIC also attached excerpts from Lynch's and Meier's depositions to their special-appearance response. Meier admitted to sending multiple emails to Cosby, Nichols, and other Carlile employees in Texas that relayed information relevant to the due-diligence process. Meier personally prepared some of the compiled documents that he forwarded to Cosby and Nichols in Texas by email. Lynch also participated in compiling the due-diligence information that he knew was forwarded to Carlile in Texas. Both Meier and Lynch stated that they compiled and provided the information either at J. Bryant's request or with his approval. Nichols stated that Carlile relied on much of this information in making its decision about the advisability of a merger. Lynch again admitted to meeting with Carlile representatives in 2011 at Carlile's offices in Texas to discuss "different regions of our company where maybe improvements could [be] made and those kinds of things." Lynch also talked with Cosby by phone and email, while Cosby was located in Texas, presumably about Lynch's future employment agreement with Carlile. Both Lynch and Meier were aware that Carlile was located in Texas.

The trial court overruled J. Bryant's, Lynch's, and Meier's objections to the exercise of personal jurisdiction but sustained the remaining directors' objections. *See* Tex. R. Civ. P. 120a(4). The trial court did not make findings of fact or conclusions of law and none were requested. *See* Tex. R. Civ. P. 296. Meier,

11

Lynch, Carlile, and WIC appeal the trial court's interlocutory rulings.[8]  *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2014); Tex. R. App. P. 28.1(a).  Lynch and Meier assert in three issues that the trial court erred in overruling their special appearance because the Texas long-arm statute was not satisfied, they did not have minimum contacts with Texas, and the exercise of jurisdiction over them would offend notions of fair play and substantial justice. Carlile and WIC assert in a sole issue that the trial court erred in sustaining the remaining directors' special appearance because the forum-selection clauses contained in the agreement, the amended agreement, the releases, and the merger agreement operated as the remaining directors' consent to the trial court's jurisdiction.  In their reply brief, Lynch and Meier assert that they, like the remaining directors, are not subject to the forum-selection clauses, which further supports their special appearance.

## II.  FORUM-SELECTION CLAUSES

We first address whether the contractual clauses setting venue and the applicable law for any disputes apply to Carlile and WIC's claims against Lynch, Meier, and the remaining directors such that Lynch, Meier, and the remaining directors consented to jurisdiction in Texas.  We do so because the presence of a valid and enforceable forum-selection clause circumvents the need to conduct a due-process and minimum-contacts analysis because such a clause acts as

---

[8]J. Bryant did not appeal the denial of his special appearance.

12

consent to jurisdiction in the contracted-for forum. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589–90, 111 S. Ct. 1522, 1525 (1991); *Baker Hughes Inc. v. Brooks*, 405 S.W.3d 246, 249 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *RSR Corp. v. Siegmund*, 309 S.W.3d 686, 704 (Tex. App.—Dallas 2010, no pet.); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14, 105 S. Ct. 2174, 2182 n.14 (1985) (recognizing personal jurisdiction is a waivable right and party may give express or implied consent to jurisdiction under "variety of legal arrangements"). In short, if a party contractually consents to jurisdiction in a particular forum, the trial court's exercise of jurisdiction over that party will not offend due process even in the absence of minimum contacts with Texas. *Dos Santos v. Bell Helicopter Textron, Inc.*, 651 F. Supp. 2d 550, 554 (N.D. Tex. 2009); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 792 (Tex. 2005); *RSR Corp.*, 309 S.W.3d at 704; *Tri-State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P.*, 184 S.W.3d 242, 248 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

## A. STANDARD OF REVIEW

Because the trial court did not issue findings of fact and conclusions of law, we infer that the trial court made all fact findings that have support in the record and that are necessary to uphold the ruling.[9] *CNOOC Se. Asia Ltd. v. Paladin*

---

[9]At various points in their briefs, the parties rely on statements the trial court made at a hearing on the special appearances to support their respective arguments regarding what the trial court found or concluded. Such statements are not the equivalent of findings of fact and conclusions of law, and we will not

13

*Res. (SUNDA) Ltd.*, 222 S.W.3d 889, 894 (Tex. App.—Dallas 2007, pets. denied) (op. on reh'g); *see also Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794–95 (Tex. 2002). We review the trial court's decision whether to enforce forum-selection clauses for an abuse of discretion. *Brown v. Mesa Distribs., Inc.*, 414 S.W.3d 279, 284 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "Under an abuse of discretion standard, we defer to the trial court's factual determinations if they are supported by the evidence, but we review the trial court's legal determinations de novo." *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding). Therefore, to the extent our review involves contractual interpretation of a forum-selection clause, we employ a de novo standard of review. *Phoenix Network Techs. v. Neon Sys.*, 177 S.W.3d 605, 610 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

When we are asked to enforce a forum-selection provision, we first determine whether the contract in fact contains such a clause by using ordinary principles of contract interpretation. *RSR Corp.*, 309 S.W.3d at 700. If such a clause is found, we then determine whether there is any reason to deem it unenforceable, recognizing that the presumption is that the clause is indeed enforceable. *In re Int'l Profit Assocs.*, 274 S.W.3d 672, 675 (Tex. 2009) (orig. proceeding); *RSR Corp.*, 309 S.W.3d at 700. Assuming the clause is

construe them to be so in our review. *See Amend v. Watson*, 333 S.W.3d 625, 628 n.2 (Tex. App.—Dallas 2009, no pet.).

enforceable, we finally decide whether the clause applies to the particular claims or issues being litigated. *In re Lisa Laser, Inc.*, 310 S.W.3d 880, 884–86 (Tex. 2010) (orig. proceeding).

## B. FORUM OR VENUE

It is uncontroverted that some of the written agreements entered into at various times during the parties' negotiations contained clauses that contractually set venue for any litigation arising out of the agreements in the courts of Tarrant County, Texas. Carlile, WIC, and the remaining directors refer to the operative clauses as forum-selection clauses, but Lynch and Meier assert the clauses are venue-selection clauses that do not confer jurisdiction as forum-selection clauses do.

A forum-selection clause is a contractual provision that selects the adjudicative body in which jurisdiction is properly invoked, while a venue-selection clause selects the geographic place of trial. *In re Great Lakes Dredge & Dock Co.*, 251 S.W.3d 68, 73–74 (Tex. App.—Corpus Christi 2008, orig. proceeding). In some instances, the difference between the two clauses is key. *Id.*; Jeremy Jones, Comment, *Forum and Venue Selection Clauses in Seamen's Employment Contracts: Can Contractual Stipulations be Used to Defeat a Seaman's Choice of Forum or Venue in a Jones Act Claim?*, 85 Tul. L. Rev. 519, 523–24 (2010). However, Texas and federal courts have referred to contractual-venue provisions that are similar to the provisions at issue in this case as forum-selection clauses, which equate to a consent to personal jurisdiction. *Carnival*

15

*Cruise Lines*, 499 U.S. at 587–88, 595, 111 S. Ct. at 1524, 1528; *Alliance Health Group, LLC v. Bridging Health Options, LLC*, 553 F.3d 397, 399 (5th Cir. 2008); *Michiana*, 168 S.W.3d at 792; *Lindsey v. RGK Consultants, LLC*, No. 14-09-00855-CV, 2010 WL 1189440, at *1–2 (Tex. App.—Houston [14th Dist.] Mar. 30, 2010, no pet.) (mem. op.); *cf. In re Fisher*, No. 12-0163, 2014 WL 801160, at *1, 8–9 (Tex. May 2, 2014) (orig. proceeding) (corrected op. on reh'g) (referring to contractual clause, which mandated that any legal action arising out of the agreement would be brought only in a Texas court, as venue-selection clause but recognizing that clause was a consent to personal jurisdiction and venue).

Contrary to Lynch, Meier, and the remaining directors' argument, there is no requirement that a contractual venue clause specifically contain the words "forum," "jurisdiction," or "consent" to be considered a consent to jurisdiction. *See Kevlin Servs., Inc. v. Lexington State Bank*, 46 F.3d 13, 14–15 (5th Cir. 1995); *Lindsey*, 2010 WL 1189440, at *2–3. Indeed, a forum-selection clause is, by definition, a clause specifying a particular venue, i.e., place, for suit. *Mendoza v. Microsoft, Inc.*, No. 5:13-CV-378-DAE, 2014 WL 842929, at *9 (W.D. Tex. Mar. 5, 2014). Thus, we conclude that, to the extent there is a case-affecting difference between forum-selection and venue-selection clauses under the facts of this case, the operative clauses are forum-selection clauses. *E.g., Lindsey*, 2010 WL 1189440, at *2. Because the clauses at issue are forum-selection clauses, they are presumptively valid. *Laibe*, 307 S.W.3d at 316.

16

## C. ENFORCEMENT AGAINST NONSIGNATORIES

Lynch, Meier, and the remaining directors assert that the presumptively-valid forum-selection clauses are not enforceable against them so as to confer personal jurisdiction because they were not signatories to the agreement, the amended agreement, the second amended agreement, or the merger agreement. Indeed, a forum-selection clause in an agreement can be enforced as to a nonsignatory only if the nonsignatory is bound by that agreement under recognized contract or agency principles. *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517 (5th Cir. 2006); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (orig. proceeding).

Carlile and WIC bore the burden to identify and prove a theory under which the nonsignatories could be bound by the forum-selection clauses. *See CNOOC*, 222 S.W.3d at 894–95. Carlile and WIC do not argue that Lynch, Meier, or the remaining directors personally signed any of these three documents; instead, they assert that Lynch, Meier, and the remaining directors are bound by the forum-selection clauses under the doctrine of direct-benefits estoppel and as transaction participants. *See Quality Custom Rail & Metal, LLC v. Travelers Cas. & Sur. Co. of Am.*, No. 3:13-CV-3587-D, 2014 WL 840046, at *3 (N.D. Tex. Mar. 4, 2014); *Tex. Source Group, Inc. v. CCH, Inc.*, 967 F. Supp. 234, 237 (S.D. Tex. 1997); *Kellogg*, 166 S.W.3d at 739; *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod.*, 234 S.W.3d 679, 693 & n.8 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

### 1. Direct-Benefits Estoppel

Direct-benefits estoppel, which was initially developed in the context of arbitration clauses,[10] applies when a nonsignatory "knowingly exploits the agreement containing the arbitration clause." *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 361–62 (5th Cir. 2003) (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199 (3d Cir. 2001)). The doctrine is invoked if "non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Hellenic*, 464 F.3d 517–18; *see also Carr v. Main Carr Dev., LLC*, 337 S.W.3d 489, 497 (Tex. App.—Dallas 2011, pet. denied).

Direct-benefits estoppel has been applied to enforce forum-selection clauses against nonsignatories seeking to sue on the contract containing the forum-selection clause. *See, e.g.*, *Hellenic*, 464 F.3d at 520. But as the United States Court of Appeals for the Fifth Circuit has pointed out, direct-benefits estoppel is "seriously consider[ed]" only when "the nonsignatory had brought suit against a signatory premised in part upon the agreement." *Bridas*, 345 F.3d at

---

[10]We look to cases applying direct-benefits estoppel in the context of arbitration clauses because arbitration clauses are a type of forum-selection clause. *See St. Clair v. Brooke Franchise Corp.*, No. 2-06-216-CV, 2007 WL 1095554, at *4 (Tex. App.—Fort Worth Apr. 12, 2007, no pet.) (mem. op.). *See generally Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 534, 115 S. Ct. 2322, 2326 (1995) (recognizing arbitration provisions are a subset of forum-selection clauses).

362. *See generally MaxEn Capital, LLC v. Sutherland*, No. H-08-3590, 2009 WL 936895, at *5 (S.D. Tex. Apr. 3, 2009) (collecting cases enforcing forum-selection and arbitration clauses against nonsignatories based on estoppel). In other words, the party position of the nonsignatory in the lawsuit—plaintiff or defendant—is an important distinction in deciding whether estoppel can bind a nonsignatory to a contract's terms. *See Bridas*, 345 F.3d at 361 ("[T]he [nonsignatory defendant] . . . did not sign a contract containing an arbitration provision and never sued [plaintiff] on the agreement. The distinction is *not* one without a difference."). Here, Lynch, Meier, and the remaining directors did not sue Carlile or WIC under the agreement, the amended agreement, the second amended agreement, or the merger agreement. Thus, they did not "exploit" the agreements containing the Tarrant County forum-selection clauses to the degree required for direct-benefits estoppel. *See id.* at 362. Indeed, estoppel is a defensive theory, not a theory by which a signatory plaintiff may hold a nonsignatory defendant to the terms of a contract the nonsignatory defendant is not seeking to enforce. *See Perry Homes v. Cull*, 258 S.W.3d 580, 593 (Tex. 2008), *cert. denied*, 855 U.S. 1103 (2009); *see also Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 526–28 (5th Cir. 2000) (estopping a signatory plaintiff from relying on defendants' status as nonsignatories to prevent *defendants* from compelling arbitration under contractual provision), *cert. denied*, 531 U.S. 103 (2000).

19

However, "a nonparty may seek or obtain direct benefits from a contract by means other than a lawsuit." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 132 (Tex. 2005) (orig. proceeding). Indeed, a nonsignatory also can exploit a contract by knowingly seeking and obtaining direct and substantial benefits from that contract. *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010); *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1074 (5th Cir. 2002); *Weekley Homes*, 180 S.W.3d at 131–33. Carlile and WIC assert that the remaining directors' invocation of the indemnity provision and their receipt of the proceeds from the merger were direct and substantial benefits justifying a conclusion that direct-benefits estoppel applies. Carlile and WIC also argue that Lynch additionally received "the benefit of employment with Carlile" and that Lynch and Meier, along with the benefits received by the remaining directors, received tail insurance.

Lynch's employment agreement did not include a Tarrant County forum-selection clause and was a separate agreement from the merger agreements; thus, Lynch's employment cannot be considered a benefit derived from the merger agreements implicating direct-benefits estoppel. The receipt of the proceeds from the merger also is not a sufficient substantial benefit for the purposes of direct-benefits estoppel. *See St. Clair*, 2007 WL 1095554, at *7 (holding wife's receipt of sale proceeds as part of community estate where she did not negotiate or participate in sale was not a benefit sufficient to invoke estoppel). The indemnity provision and the availability of tail insurance, likewise,

20

are insufficient to show a substantial benefit because there is no evidence that Carlile and WIC actually indemnified Lynch, Meier, or the remaining directors or that Lynch and Meier claimed coverage under the tail insurance. Carlile and WIC failed to meet their burden to prove direct-benefits estoppel such that the nonsignatory defendants could be bound by the forum-selection clauses.

Finally, we note that estoppel is an equitable theory that may or may not be applied at the trial court's discretion. *See Weekley Homes*, 180 S.W.3d at 134–35; *VSR Fin. Servs., Inc. v. McLendon*, 409 S.W.3d 817, 830 (Tex. App.—Dallas 2013, no pet.). On the record before us, we cannot conclude that the trial court clearly abused that discretion in declining to enforce the forum-selection clauses against nonsignatories Lynch, Meier, and the remaining directors under direct-benefits estoppel.

## 2. Transaction Participants

Carlile and WIC next assert that the forum-selection clauses may be enforced against Lynch, Meier, and the remaining directors because they participated in and were closely related to the merger:

> [The remaining directors] made the decision initially to sell WIC. They approved the retention of St. Charles to find a buyer. They directed St. Charles to solicit Carlile in Texas. They approved the sale of the WIC stock to Carlile. They approved and authorized Jerry Bryant to execute the agreements containing the choice of forum clauses. They approved and directed the distribution of a Proxy Statement to WIC's shareholders. They recommended that the WIC shareholders vote in favor of the transaction. . . . They signed Support Agreements promising to support the merger. . . . Last, but certainly not least, [they] personally received approximately $4 million of Carlile's money in the transaction.

21

Regarding Lynch and Meier, Carlile and WIC raise the same actions quoted above but add that Lynch and Meier "were actively involved in the pre-closing activities leading to the transaction, including providing due diligence materials to Carlile, and participated in telephone calls with Carlile." Carlile and WIC recognize that "[n]either the Texas Supreme Court nor this [c]ourt has ruled on the enforceability of forum-selection clauses by or against non-signatories who participated in the transaction." *See Deep Water*, 234 S.W.3d at 693.

Nonsignatories may be subject to forum-selection clauses if they were transaction participants. *See Brock v. Entre Computer Ctrs., Inc.*, 740 F. Supp. 428, 430–31 (E.D. Tex. 1990). However, all cases analyzing whether a nonsignatory is a transaction participant apply the issue solely in the context of a nonsignatory defendant attempting to enforce a forum-selection clause against a signatory plaintiff, who did not want the clause enforced. *See CNOOC*, 222 S.W.3d at 898 (collecting cases); *see also Quicksilver Resources, Inc. v. Eagle Drilling, LLC*, 792 F. Supp. 2d 948, 953 & n.5 (S.D. Tex. 2011) (declining to enforce choice-of-law provision against nonsignatory officers, directors, and shareholders of signatory corporation by plaintiff signatory and stating defendant nonsignatories not third-party beneficiaries or closely related). Based on the record before us and the paucity of legal authority applying the transaction-participant theory to enforce a forum-selection clause against a nonsignatory in a suit brought by a signatory, we conclude that Carlile and WIC have failed to carry

22

their burden to identify and prove a theory under which the nonsignatories could be bound by the forum-selection clauses.

### 3. Summary

Carlile and WIC could not enforce the forum-selection clauses against nonsignatories Lynch, Meier, and the remaining directors under either direct-benefits estoppel or as transaction participants. The trial court did not err by concluding that the forum-selection clauses could not be enforced against the remaining directors.[11] Therefore, we need not decide whether Carlile and WIC's claims fall within the scope of the forum-selection clauses. *See* Tex. R. App. P. 47.1. We overrule Carlile and WIC's sole issue.

## III. IN PERSONAM JURISDICTION

We now decide whether the trial court correctly exercised jurisdiction over Lynch and Meier on the basis of minimum contacts. Carlile and WIC do not argue on appeal that the trial court had in personam jurisdiction over the remaining directors on the basis of the long-arm statute and due process: "The only issue here is whether the [remaining directors] consented to jurisdiction

---

[11]Although the trial court would have erred by overruling Lynch's and Meier's special appearances because the forum-selection clauses constituted their consent to jurisdiction, we may uphold the trial court's ruling on any legal basis finding support in the record, i.e., Lynch's and Meier's minimum contacts with the forum state. Therefore, our conclusion regarding the enforceability of the forum-selection clause against the nonsignatories alone is not fatal to the trial court's ruling. *See Dukatt v. Dukatt*, 355 S.W.3d 231, 237 (Tex. App.—Dallas 2011, pet. denied) (recognizing appellate courts must affirm denial of special appearance on any legal theory supported by the evidence in the absence of findings and conclusions).

23

pursuant to the forum-selection clause.  Under that analysis, the [remaining directors'] contacts with Texas, or lack thereof, are irrelevant."  Therefore, we address the presence of in personam jurisdiction only regarding Lynch and Meier.  As stated above, Lynch and Meier assert that the trial court lacked in personam jurisdiction over them because the long-arm statute does not apply and because minimum contacts with Texas are absent.

### A. STANDARDS AND SCOPE OF REVIEW

### 1. Appellate Prism

The standards of review and the burdens of proof applicable to our review of a trial court's ruling on a special appearance are well established.  We determine whether a trial court has personal jurisdiction over a defendant under a de novo standard.  *BMC Software*, 83 S.W.3d at 794; *Fish v. Tandy Corp.*, 948 S.W.2d 886, 891–92 (Tex. App.—Fort Worth 1997, writ denied).  A plaintiff has the initial burden to plead sufficient allegations to bring a nonresident within the provisions of the Texas long-arm statute.  *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010); *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009).  Once a plaintiff sufficiently pleads such jurisdictional allegations, the burden shifts to the defendant to negate the bases of personal jurisdiction asserted by the plaintiff.  *Kelly*, 301 S.W.3d at 658; *Moki Mac*, 221 S.W.3d at 574.

In determining whether the nonresident defendant sufficiently negated the pleaded bases for personal jurisdiction, the trial court frequently must resolve

24

questions of fact. *BMC Software*, 83 S.W.3d at 794. While we review de novo the trial court's legal conclusion that personal jurisdiction does not exist, any supporting findings of fact are reviewed for factual and legal sufficiency. *Id.* If the trial court's findings are supported by sufficient evidence, we must decide as a matter of law whether those facts negate all bases for personal jurisdiction. *Id.* In reviewing the factual sufficiency of the evidence to support a fact finding,[12] we may only "unfind" an implied factual finding if we determine that the credible evidence supporting the finding is too weak or that the finding is against the great weight and preponderance of the credible evidence contrary to the finding.[13] *Tex. Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## 2. Long-Arm Statute and Due Process

Of course, a special appearance challenges the trial court's personal jurisdiction over a defendant. Texas courts may not exercise personal jurisdiction over a nonresident defendant unless federal due process requirements and the Texas long-arm statute are satisfied. Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.042 (West 2008); *Helicopteros Nacionales de*

---

[12]Lynch and Meier do not challenge the legal sufficiency of the trial court's implied findings.

[13]This standard applies because Lynch and Meier had the burden to disprove Carlile and WIC's pleaded jurisdictional facts. *See Gooch v. Am. Sling Co.*, 902 S.W.2d 181, 184 (Tex. App.—Fort Worth 1995, no writ); W. Wendell Hall, *Hall's Standards of Review in Texas*, 42 St. Mary's L.J. 3, 41–42 (2010).

25

*Colom., S.A. v. Hall*, 466 U.S. 408, 412–13 & n.7, 104 S. Ct. 1868, 1871 & n.7 (1984). The Texas long-arm statute and the requirements of due process are coextensive; thus, the long-arm statute is satisfied if the exercise of personal jurisdiction comports with federal due process. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991). As such, we rely on federal and Texas jurisprudence in resolving questions regarding personal jurisdiction. *BMC Software*, 83 S.W.3d at 795. Federal due process is satisfied if (1) the nonresident defendant has "minimum contacts" with Texas and (2) the exercise of personal jurisdiction over the nonresident defendant does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemp't Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945).

## B. APPLICATION

### 1. Sufficient Pleading Invoking Long-Arm Statute

We first determine whether Carlile and WIC met their initial burden to plead sufficient allegations to bring Lynch and Meier within the provisions of the Texas long-arm statute, without reaching the merits of those allegations.[14] *See*

---

[14]Lynch and Meier argue that Carlile and WIC's failure to specifically allege jurisdictional facts in their original and first amended petitions indicates they did not meet this initial burden. But Carlile and WIC's live pleading filed before the special-appearance hearing included jurisdictional allegations and is the pleading we rely on. *See* Tex. R. Civ. P. 65 (providing amended pleading replaces and supersedes previous pleading); *cf. Frank A. Smith Sales, Inc. v. Atl. Aero, Inc.*, 31 S.W.3d 742, 747 (Tex. App.—Corpus Christi 2000, no pet.) ("The meaning of

*Hoffman v. Dandurand*, 143 S.W.3d 555, 559 (Tex. App.—Dallas 2004, no pet.). Under the long-arm statute, personal jurisdiction attaches to a nonresident defendant who "commits a tort in whole or in part in [Texas]" or "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in [Texas]." Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1)–(2) (West 2008).

Here, Carlile and WIC pleaded that Lynch and Meier were Colorado residents but that they committed "torts in whole or in part in Texas," i.e., fraud and negligent misrepresentation. They further asserted that Lynch and Meier "contracted by mail or otherwise with a Texas resident and either party is to perform the contracts in whole or in part in [Texas]." In support of these claims, Carlile and WIC alleged that Lynch and Meier concealed and failed to disclose information in Texas during the merger negotiations. These allegations met Carlile and WIC's initial pleading burden by alleging acts or omissions in Texas by Lynch and Meier, personally or through an agent, and torts arising from such conduct. *See, e.g.*, *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013); *Baldwin v. Household Int'l, Inc.*, 36 S.W.3d 273, 277 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

Lynch and Meier argue at length that Carlile and WIC failed to meet their burden to plead a jurisdictional basis under the long-arm statute. In these

the term 'pleadings' must be limited at least so as to exclude matter not filed prior to the special appearance hearing.").

27

arguments, they delve into the merits of Carlile and WIC's claims by asserting that the alleged acts were not purposefully committed within Texas; any concealment was by omission and occurred in Colorado; no fiduciary relationship between Lynch, Meier, and Carlile was pleaded or proven; no substantially false impression by any concealment was pleaded or proven; Carlile and WIC failed to plead or prove that J. Bryant was acting within the scope of his authority; and Lynch and Meier could not foresee being hailed to court in Texas. These arguments go to the merits of Carlile and WIC's allegations and are not appropriate considerations in determining whether Carlile and WIC met their initial *pleading* burden under the long-arm statute. *See, e.g.*, *Guardian Royal*, 815 S.W.2d at 227 (holding "[f]oreseeability is . . . important consideration in deciding whether the nonresident defendant has purposely established 'minimum contacts'" but not considering foreseeability in context of initial pleading burden); *Leesboro Corp. v. Hendrickson*, 322 S.W.3d 922, 929 (Tex. App.—Austin 2010, no pet.) (considering whether corporate representative's acts could be imputed to corporation in determining minimum contacts, not initial pleading burden).

## 2. Due Process

Because Carlile and WIC sufficiently pleaded allegations to bring Lynch and Meier within the provisions of the Texas long-arm statute, the burden then shifted to Lynch and Meier to negate all pleaded jurisdictional bases and, thereby, establish a violation of their rights to due process. *Retamco*, 278 S.W.3d at 337; *see Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990)

28

(recognizing jurisdiction over nonresident supportable if long-arm statute authorizes such jurisdiction and it is consistent with due-process guarantees). Lynch and Meier assert that exercising specific jurisdiction over them would violate due process because (1) the evidence is factually insufficient to establish their minimum contacts with Texas and (2) any exercise of jurisdiction would offend traditional notions of fair play and substantial justice.

### a. Minimum contacts

### (1) purposeful availment

When, as here, a plaintiff asserts specific jurisdiction, the minimum-contacts analysis focuses on the relationship between the defendant, the forum, and the litigation.[15] *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 596 (Tex. 2007). Minimum contacts are sufficient when a nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958). In determining purposeful availment, we consider (1) the defendant's own actions but not the unilateral activity of another party, (2) whether the defendant's actions were purposeful rather than "random, isolated, or fortuitous," and (3) whether the defendant sought "some benefit, advantage, or profit by availing itself of the privilege of doing business in Texas." *Michiana*, 168 S.W.3d at 785. The nonresident defendant's contacts are

---

[15]Carlile and WIC concede that the trial court did not have general jurisdiction over Lynch or Meier.

29

considered as a whole and not in isolation, focusing on the quality and not the quantity of the contacts. *Retamco*, 278 S.W.3d at 339; *Guardian Royal*, 815 S.W.2d at 230 n.11. We look to the relationship between the defendant, the forum, and the litigation. *Moki Mac*, 221 S.W.3d at 576.

Here both Meier and Lynch agreed as officers and directors of the Bank and WIC to seek out Carlile in Texas regarding a potential acquisition of WIC and the Bank. Meier and Lynch were directly involved in compiling information for the ensuing due diligence, which they knew would be produced to Carlile in Texas as part of the merger negotiations. Both Meier and Lynch directed emails to Carlile employees in Texas that provided further due-diligence information. Lynch traveled to Texas to meet with Carlile employees about the possible merger and had phone conversations with Cosby.[16]

These contacts were not random and fortuitous but were specifically directed to Carlile in Texas for the purposes of due diligence and the ensuing merger. *See generally Michiana,* 168 S.W.3d at 785 (holding "[s]ellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state'" are purposeful rather than fortuitous contacts (quoting *Travelers Health Ass'n v. Commonwealth of Va. ex rel. State Corp.*

---

[16]For the reasons we stated in *Glencoe*, we are not concluding that phone calls, standing in isolation, are sufficient to establish purposeful availment. *Glencoe Capital Partners II, L.P. v. Gernsbacher*, 269 S.W.3d 157, 165–67 (Tex. App.—Fort Worth 2008, no pet.). However, phone calls combined with other contacts satisfying the three inquiries of purposeful availment can support the exercise of specific jurisdiction. *See also Moncrief Oil*, 414 S.W.3d at 151–53.

30

*Comm'n*, 339 U.S. 643, 647, 70 S. Ct. 927, 929 (1950))). The merger discussions and exchange of information were not unilateral and showed that Lynch and Meier were availing themselves of the privilege of conducting business—a possible corporate merger—with a Texas corporation. The due-diligence process lasted over a year, resulting in amended agreements and a final merger agreement. Lynch and Meier were involved in this process and sought some benefit or advantage by availing themselves of Texas jurisdiction— a merger with Carlile. Further, Meier and Lynch directed the produced information to Carlile in Texas. *See Wien Air Alaska v. Brandt*, 195 F.3d 208, 213–15 (5th Cir. 1999) (holding German attorney's alleged misrepresentations and omissions directed to Texas, while limited, were sufficient contacts to confer personal jurisdiction over him in a Texas court). Further, Lynch and Meier were experienced businessmen and knew the information they provided would be relied on by Carlile in making the ultimate decision on merging with WIC—a decision that was made in Texas. Lynch and Meier could reasonably foresee being haled into a Texas court based on their purposeful actions directed to Texas. *See Moki Mac*, 221 S.W.3d at 576–79 (finding purposeful availment by nonresident company that made alleged material misrepresentations to resident plaintiffs in Texas, which were relied on by resident plaintiffs to their detriment); *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 436 (Tex. 1982) ("Villa's solicitation of Texas business, consisting of representations made in Texas, is a purposeful act committed in Texas.").

31

Lynch and Meier assert, however, that any actions they took were at the direction of J. Bryant and that they had no input into what information to produce. But considering the evidence before the trial court, we cannot conclude that the evidence supporting the trial court's implied findings regarding purposeful availment was too weak or that the findings were against the great weight and preponderance of the credible evidence contrary to the implied finding. Indeed, Nichols's affidavit contradicts Meier's and Lynch's averments that they were passive conduits of information at the mercy of J. Bryant. We conclude that the trial court's conclusion that Lynch and Meier purposefully availed themselves of the privilege of conducting business in Texas was supported by factually sufficient evidence. *See, e.g.*, *Parex Res., Inc. v. ERG Res., LLC*, 427 S.W.3d 407, 436–40 (Tex. App.—Houston [14th Dist.] 2014, pets. filed); *Leesboro*, 322 S.W.3d at 929–32; *Glencoe*, 269 S.W.3d at 165–67.

## (2) substantial connection

Purposeful availment alone does not support the exercise of specific jurisdiction unless the defendant's potential liability arises from or relates to the forum contacts. *Guardian Royal*, 815 S.W.2d at 228; *Glencoe*, 269 S.W.3d at 167. In short, there must be a substantial connection between the defendant's contacts with the forum and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 584.

Here, Meier and Lynch communicated with and provided information to Carlile in Texas multiple times, which Carlile relied on in deciding to merge with

32

WIC. Lynch even traveled to Texas to discuss the possible merger and reviewed the financial status of the Bank at that time. Carlile alleges that this information was incorrect and resulted in losses to Carlile in Texas, leading to their claims for fraud and misrepresentation. Thus, the contacts showing purposeful availment are the operative facts of the litigation. Lynch's and Meier's liability, if any, will arise from the type and scope of the information they produced to Carlile in Texas. The trial court's conclusion that there was a substantial connection between Lynch's and Meier's qualitative contacts and the facts of the litigation was supported by factually sufficient evidence. *See Glencoe*, 269 S.W.3d at 167.

### 3. Fair Play and Substantial Justice

If minimum contacts are present, whether general or specific, the nonresident defendant then bears the burden to establish that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. *Prof'l Ass'n of Golf Officials v. Phillips Campbell & Phillips, L.L.P.*, No. 02-12-00426-CV, 2013 WL 6869862, at *5 (Tex. App.—Fort Worth Dec. 27, 2013, pet. denied) (mem. op.) (citing *Knight Corp. v. Knight*, 367 S.W.3d 715, 726 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding)). When the nonresident defendant has purposefully established minimum contacts with the forum state, it will be rare that the exercise of jurisdiction over the nonresident defendant would not comport with fair play and substantial justice. *Guardian Royal*, 815 S.W.2d at 231.

Lynch and Meier assert that Carlile and WIC failed to show that fair play and substantial justice require Texas jurisdiction. But the burden was on Lynch and Meier, not Carlile and WIC, to "present 'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'" *Id.* (quoting *Burger King*, 471 U.S. at 477, 105 S. Ct. at 2185). The relevant considerations we are to review in determining whether the exercise of jurisdiction comports with fair play and substantial justice are (1) the burden on the defendants, (2) the interest of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S. Ct. 559, 564 (1980); *Guardian Royal*, 815 S.W.2d at 228. Lynch and Meier focus on the first two considerations.

Lynch's and Meier's affidavits offered in support of their special appearance state no evidence relative to these considerations other than their assertions that they reside in Colorado. In their brief on appeal, they refer to the "expense of hotel and ground travel . . . compared to that of the Carlile representative" and "the cost of discovery since most of the witnesses are located in Colorado." However, there is no record evidence of the burdensomeness of litigating in Texas and, indeed, "[d]istance from the forum is generally not sufficient to defeat jurisdiction because the availability of 'modern

34

transportation and communication have made it less burdensome for a party sued to defend himself in a State where he engages in economic activity.'" *Glencoe*, 269 S.W.3d at 168 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S. Ct. 199, 201 (1957)).

Additionally, Lynch's and Meier's alleged misrepresentations were purposefully directed into Texas, where it was foreseeable that a Texas resident would rely on them. *See Charles R. Weber Co. v. Back-Haul Bulk Carriers, Inc.*, No. 14-02-00240-CV, 2002 WL 31769418, at *5 (Tex. App.—Houston [14th Dist.] Dec. 12, 2002, no pet.) (not designated for publication). Texas generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by nonresidents. *See Burger King*, 471 U.S. at 473, 105 S. Ct. at 2182–83. Lynch and Meier have not demonstrated that the interests of Colorado or the shared interests of all the states outweigh Texas's substantial interest in providing relief to its residents. Lynch and Meier have not identified any considerations that would render jurisdiction in Texas unreasonable or that provide them with a vested right not to be sued in Texas. Accordingly, we conclude that Lynch and Meier failed to meet their burden to establish a compelling case that the trial court's exercise of personal jurisdiction over Lynch and Meier would offend traditional notions of fair play and substantial justice. *See, e.g.*, *Tempest Broad. Corp. v. Imlay*, 150 S.W.3d at 861, 876–77 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Rowland & Rowland, P.C. v. Tex. Emp'rs Indem. Co.*, 973 S.W.2d 432, 436 (Tex. App.—Austin 1998, no pet.).

35

## 4. Summary

Carlile and WIC pleaded sufficient allegations bringing Lynch and Meier within the provisions of the Texas long-arm statute. Lynch and Meier then failed to establish the violation of their rights to due process because the record supported the trial court's conclusion that Lynch and Meier had minimum contacts with Texas sufficient to establish specific jurisdiction. Lynch and Meier also failed to present a compelling case that that the trial court's exercise of personal jurisdiction over Lynch and Meier would offend traditional notions of fair play and substantial justice. Therefore, we overrule Lynch and Meier's three points.

## IV. CONCLUSION

Because Carlile and WIC could not enforce the forum-selection clauses against nonsignatories Lynch, Meier, and the remaining directors under either direct-benefits estoppel or as transaction participants, the trial court did not err by concluding that the forum-selection clauses were unenforceable. Thus, the trial court correctly sustained the remaining directors' special appearance. Although the forum-selection clauses were unenforceable against Lynch and Meier, the trial court correctly overruled their special appearances because the record supported the trial court's conclusion that in personam jurisdiction over Lynch and Meier was present and did not offend due process or the traditional notions of fair play and substantial justice. We affirm the trial court's interlocutory orders. *See* Tex. R. App. P. 43.2(a).

36

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

DELIVERED:  August 7, 2014