

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-08-009-CV

GLENCOE CAPITAL PARTNERS II, L.P.,                                    APPELLANTS
TERENCE S. MALONE, LOUIS J. MANETTI,
RICHARD A. COONROD, DAVID S. EVANS, AND
RONALD D. WRAY

V.

HAROLD GERNSBACHER, REUBEN N. PALM,                                   APPELLEES
MICHAEL N. PALM, SHANNON PALM, JAMES G.
PALM, SUSAN PALM, MARK R. PALM, PAMELA
PALM, THOMAS L. PALM, MAUREEN PALM,
RICHARD F. PALM, KRISTIN PALM, ROBERT N.
ZINTGRAFF, AND ZINTGRAFF INVESTMENTS, LTD.
(BY ZINTGRAFF MANAGEMENT TRUST AND
ROBERT N. ZINTGRAFF, TRUSTEE)

------------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

In this interlocutory appeal, Appellants challenge the trial court's order

overruling their special appearances. We affirm.

## I. Background

This case arises from a series of complex transactions involving the acquisition and financing of several food service equipment supply companies. Following are the allegations and jurisdictional facts relevant to this appeal.

### A. Appellees' Allegations

Appellees—Gernsbacher, Zintgraff, and the Palms—are former shareholders in what were independent food service equipment supply companies. Gernsbacher, a Texas resident, was a shareholder in Gernsbacher's, Inc., a Texas corporation based in Fort Worth. Zintgraff, also a Texas resident, was a shareholder in Top of the Table, Inc., a Texas corporation based in San Antonio. The Palms, all Minnesota residents, were shareholders in Palm Brothers, Inc., a corporation based in Minnesota.

In 2000, Strategic Equipment and Supply Corporation ("SESC"), a Delaware corporation with its corporate offices in Arizona before 2001 and in Dallas after, acquired Gernsbacher's, Top of the Table, Palm Brothers, and other food service equipment supply companies. Appellant Glencoe Partners II, L.P. ("Glencoe"), whose general partner resides in Illinois, was SESC's majority shareholder. An investment group led by Glencoe financed SESC's acquisition of the companies, and LaSalle Bank and others provided additional financing. Gernsbacher, Zintgraff, and the Palms received a collective total of $8.2 million

in SESC stock plus notes made by SESC in the original aggregate amount of $9.5 million ("the Shareholder Notes").

After the acquisitions, SESC's nine-member board of directors consisted of three Glencoe employees, including Appellant Wray (an Illinois resident); three members of the "Glencoe Executive Network" (a group of senior executives pooled by Glencoe to serve at Glencoe's pleasure on the boards of Glencoe-controlled companies), including Appellants Malone (a Michigan resident) and Coonrod (a Minnesota resident); and three former shareholders of the acquired companies, namely, Gernsbacher, Zintgraff, and Mike Palm.[1] Gernsbacher and Zintgraff continued to run their respective "divisions" of SESC from their offices in Fort Worth and San Antonio.

SESC failed to perform as well as expected. Appellants represented to Appellees in September 2001 that LaSalle Bank had demanded an immediate additional equity investment of $6 million as a condition of maintaining its relationship with SESC. Appellants decided to raise the equity investment

---

[1] Appellant Evans, an Illinois resident and Glencoe's CEO, served as an SESC director from September 2000 through March 2002 and as SESC's vice president from January 2000 though 2005. Appellant Manetti (also an Illinois resident) has been a member of Glencoe Capital's senior management since the summer of 2001 and served as an SESC director from November 2001 through March 2002.

3

through the sale of additional notes ("the New Notes"). The events surrounding the issuance of the New Notes lie at the heart of Appellees' claims.

Glencoe enlisted a Chicago investment banking firm, Lincoln Partners, to prepare a "fairness opinion" concerning the fairness of the New Notes transaction to SESC's shareholders. Appellees allege that Lincoln had extensive ties to Glencoe and was not independent and impartial, despite Lincoln's assertions to the contrary. Lincoln furnished three fairness opinions to SESC shareholders in November and December 2001.

Appellees contend that Appellants orally misrepresented the nature and effect of the New Notes in multiple SESC board meetings, in which Gernsbacher and Zintgraff participated by telephone from Texas, and that Appellants and Lincoln misrepresented the terms of the New Notes in writings, including the fairness opinions, that Appellants and Lincoln mailed to Gernsbacher and Zintgraff in Texas. Appellees allege that, among other things, Appellants represented that the New Notes would be paid if SESC sold all of its assets. They further allege that Appellants later secretly changed the terms of the New Notes to make them payable in the event of a sale only if 80% or more of the holders of the New Notes approved payment. Gernsbacher and Zintgraff eventually purchased a total of $275,000 worth of the New Notes

when the notes were issued in March 2002.  Glencoe purchased or controlled 80% of the New Notes.

SESC sold all of its operating assets to SESC Acquisition, Inc. in 2005.  SESC paid nothing to Gernsbacher, Zintgraff, and the Palms on the Shareholder Notes, and it paid nothing to Gernsbacher and Zintgraff on the New Notes.

Appellees sued Appellants and others in Tarrant County, Texas, alleging causes of action for breach of fiduciary duties, fraud, and violation of the fraudulent transfers act.  The gist of their allegations is that Appellants colluded to render worthless the SESC stock and notes held by Appellees.  Appellees seek actual damages, exemplary damages, and recession of the New Notes.

## B.    Special Appearances

Appellants filed special appearances, *see* Tex. R. Civ. P. 120a, and each individual Appellant filed a supporting affidavit.  In his affidavit, Coonrod stated that he had participated in several SESC board meetings between August 2001 and February 2002; Gernsbacher and Zintgraff participated by telephone in several of the board meetings; Coonrod did not know the locations from which either Gernsbacher or Zintgraff participated in the telephonic meetings; he never telephoned Gernsbacher or Zintgraff for any SESC board meeting; he did not draft documents related to the New Notes; and he did not mail any documents related to the New Notes to Gernsbacher or Zintgraff.  Malone's, Manetti's,

5

Wray's, and Evans's affidavits recite the same essential averments as Coonrod's, except Malone's explains that he served as chairman of SESC's board from January 2000 until early 2005 and stated that while he did draft a letter concerning the New Notes that was sent to all SESC shareholders in January 2002, he did not draft or prepare other materials related to the New Notes.

Appellants also submitted the affidavit of Beth A. Satterfield, Glencoe Capital's CFO and COO and SESC's former assistant secretary. She stated that prior to each SESC board meeting, a toll-free telephone number was circulated to the potential participants, including Gernsbacher and Zintgraff, so that they could call into the meeting.

Gernsbacher testified at the hearing on the special appearances. He said that after SESC acquired Gernsbacher's, Inc., he continued to work at Gernsbacher's as a division of SESC and served as an SESC director. He testified that he participated in SESC board meetings telephonically. When asked whether he was in Texas during the meetings, he testified that he "presume[d] [he] was in Texas . . . that's where [he] normally [was]." He further testified that "normally [the directors] had a few minutes where [they] would] talk before the meetings, and [they] would discuss where people were and what they were doing." Gernsbacher said that Appellants made

6

misrepresentations during these meetings concerning the state of SESC and the New Notes transaction.

Zintgraff testified via affidavit. He averred that all individual Appellants were fully aware that both Top of the Table and Gernsbacher's, Inc. were located in Texas and had their principal offices in Texas and that both Gernsbacher and Zintgraff were Texas residents. Zintgraff described in detail a series of board meetings between October 2001 and February 2002, in which he participated by telephone from his San Antonio office. He stated that during the meetings, each of the individual Appellants misrepresented SESC's financial condition and the supposedly urgent need for new capital at the insistence of La Salle. Zintgraff averred that the individual Appellants either made misrepresentations, failed to correct misrepresentations, or directed his attention to written misrepresentations concerning the New Notes during phone conferences in which he participated from Texas.

On December 21, 2007, the trial court denied all of Appellants' special appearances. This appeal followed.

## II. Discussion

Appellants argue that the trial court erred by denying their special appearances (1) because there is legally and factually insufficient evidence that they purposefully availed themselves of the privilege of conducting activities in

7

Texas and Appellees' claims do not arise out of any contacts Appellants may have made with Texas, and (2) because the exercise of personal jurisdiction does not comport with the due process requirements of fair play and substantial justice.[2]

**A.    Burden of Pleading and Standard of Review**

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002); *TravelJungle v. Am. Airlines, Inc.*, 212 S.W.3d 841, 845 (Tex. App.—Fort Worth 2006, no pet.); *Michel v. Rocket Eng'g Corp.*, 45 S.W.3d 658, 668 (Tex. App.—Fort Worth 2001, no pet.).  Upon filing a special appearance, the nonresident defendant assumes the burden of negating all bases of personal jurisdiction alleged by the plaintiff. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002), *cert. denied*, 537 U.S. 1191 (2003).  In other words, the defendant must disprove the

---

[2] In their first issue, Appellants ague that the trial court lacks general jurisdiction over them.  Appellees did not allege general jurisdiction in the trial court and have not briefed it on appeal.  Therefore, and because we ultimately determine that the trial court had specific jurisdiction over Appellants, we need not address general jurisdiction or Appellants' first issue. *See* Tex. R. App. P. 47.1.

existence of minimum contacts sufficient to establish personal jurisdiction over it—general, specific, or both—as alleged by the plaintiff. *See id.* Absent allegations of any specific, purposeful act through which the defendant can be said to have sought a benefit by availing itself of the jurisdiction, evidence that a defendant is a nonresident is sufficient to meet its burden. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005); *see also Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 633 (Tex. App.—Dallas 1993, writ denied).

Whether a trial court has personal jurisdiction over a defendant is a question of law. *Marchand*, 83 S.W.3d at 793; *TravelJungle*, 212 S.W.3d at 845. However, the trial court must frequently resolve fact questions before deciding the jurisdictional question. *Marchand*, 83 S.W.3d at 794. When the trial court does not enter express findings of fact and conclusions of law regarding its ruling on a special appearance, the reviewing court infers all fact findings necessary to support the judgment that are supported by the evidence. *Id.* at 794–95. When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court. *See id.* at 795; *TravelJungle*, 212 S.W.3d at 845; *Michel*, 45 S.W.3d at 668. If the reviewing court determines that the trial court's findings are supported by sufficient

9

evidence, or if the material facts are undisputed, the reviewing court decides as a matter of law whether those facts negate all bases for personal jurisdiction. *Marchand*, 83 S.W.3d at 794−95.

**B.    Specific Jurisdiction**

The Texas long-arm statute authorizes personal jurisdiction over a nonresident defendant who "does business" in Texas, which specifically includes committing a tort in Texas, in whole or in part. Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1) (Vernon 2008); *TravelJungle*, 212 S.W.3d at 845. But the statute's broad, doing-business language reaches only as far as federal due-process criteria permit; the defendant must have established minimum contacts with the forum state, and the assertion of jurisdiction must comport with "traditional notions of fair play and substantial justice." *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 596 (Tex. 2007) (citing *Marchand*, 83 S.W.3d at 795); *see also Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990).

**1.    Minimum Contacts**

When a plaintiff asserts specific jurisdiction, the minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation. *IRA Res.*, 221 S.W.3d at 596; *Moki Mac*, 221 S.W.3d at 575−76. Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant "purposefully avails" itself of the privilege of conducting activities

10

within the forum state, thus invoking the benefits and protections of its laws. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958); *IRA Res.*, 221 S.W.3d at 596; *Michiana*, 168 S.W.3d at 784. Purposeful availment is the "touchstone of jurisdictional due process." *IRA Res.*, 221 S.W.3d at 596; *Michiana*, 168 S.W.3d at 784.

Purposeful availment has at least three aspects. *IRA Res.*, 221 S.W.3d at 596; *Michiana*, 168 S.W.3d at 785. First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person. *IRA Res.*, 221 S.W.3d at 596; *Michiana*, 168 S.W.3d at 785. Second, the contacts relied upon must be purposeful rather than random, isolated, or fortuitous. *IRA Res.*, 221 S.W.3d at 596; *Michiana*, 168 S.W.3d at 785. Third, the defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction, thus impliedly consenting to its laws. *IRA Res.*, 221 S.W.3d at 596; *Michiana*, 168 S.W.3d at 785.

In this case, the principal contacts between Appellants and Texas relevant to specific jurisdiction are the telephonic board meetings, in which Gernsbacher and Zintgraff participated from Texas and during which Appellants allegedly made misrepresentations regarding SESC's financial condition and the terms of the New Notes. We must, therefore, determine whether the telephonic board meetings rise to the level of purposeful availment.

Although the supreme court has disapproved "opinions holding that . . . specific jurisdiction is *necessarily* established by allegations or evidence that a nonresident committed a tort in a telephone call from a Texas number," *Michiana*, 168 S.W.3d at 791–92 (emphasis added), it has not held that telephone calls are *never* sufficient to establish minimum contacts. In *Michiana*, a Texas resident attempted to sue an Indiana seller of motor homes in a Texas court, asserting as the basis for specific jurisdiction misrepresentations the seller allegedly made during a single phone call initiated by the Texas resident. *Id.* at 784. The supreme court noted that "changes in technology have made reliance on phone calls obsolete as proof of purposeful availment." *Id*. at 791. The phone call in *Michiana* satisfied none of the three key aspects of purposeful availment: the seller's contact with Texas resulted not from its own activity but from the Texas resident's unilateral activity, namely, the phone call initiated by the Texas resident; the seller's contact with Texas was not purposeful but isolated and fortuitous; and the seller did not "avail" itself of the privilege of doing business in Texas. *See id.* at 785. But while the seller's sole telephonic contact with Texas fell short of purposeful availment, the supreme court's use of the modifier "necessarily" in its disapproval of "opinions holding that . . . specific jurisdiction is *necessarily* established by allegations or evidence that a nonresident committed a tort in a telephone call from a Texas number"

12

suggests that telephonic contact may rise to the level of purposeful availment in different circumstances. *See id.* at 791–92.

The circumstances of this case are markedly different from the single, unsolicited, unilateral phone call in *Michiana.* Instead of *Michiana's* single phone call, this case involves many telephonic board meetings at regular intervals over a span of years—even if we limit the scope of relevant contacts to those in 2001 and 2002 when the parties discussed the New Notes, as Appellants argue we must. Unlike the seller in *Michiana*, who did not advertise or otherwise seek business from Texas residents, Appellants (according to Appellees' petition) sought to induce Texas residents—Gernsbacher and Zintgraff—to subscribe to the New Notes.

One similarity between *Michiana* and this case—a similarity that Appellants argue negates specific jurisdiction—is that neither the seller in *Michiana* nor the Appellants in this case placed phone calls to Texas. In *Michiana*, the Texas resident placed the call to the seller in Indiana. *Id.* at 781. In this case, SESC circulated a toll-free phone number to the board members before the board meetings, and the board members would call that number to participate in the meeting. Appellants averred in their special-appearance affidavits that they did not know where Zintgraff and Gernsbacher were during

13

the telephonic board meetings, and Gernsbacher conceded that he could have phoned into the meetings from any state.

But again, the differences between this case and *Michiana* outweigh the similarities. Unlike the one-time, unsolicited, fortuitous transaction between the seller and the Texas resident in *Michiana*, Appellants had a long-time, ongoing relationship with Gernsbacher and Zintgraff, whom they knew to be Texas residents and whom they knew operated the Fort Worth and San Antonio divisions of SESC. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 470, 105 S. Ct. 2174, 2181 (1985) (noting long-term relationship between Florida franchisor and Michigan franchisee as significant factor in subjecting franchisee to Florida jurisdiction). Moreover, to the extent that it makes a difference whether Appellants knew where Gernsbacher and Zintgraff were during the board meetings, the record contains evidence showing that they *did* know that Gernsbacher and Zintgraff called into the meetings from Texas. Zintgraff testified that he always participated in the meetings from his San Antonio office; Gernsbacher testified that he participated from his Fort Worth office most of the time; and Gernsbacher testified that "normally [the board] had a few minutes where [they would] talk before the meetings, and [they] would talk about where people were and what they were doing."

14

Even if Appellants did not know that Gernsbacher and Zintgraff participated in the meetings from Texas, that ignorance alone is not enough to negate specific jurisdiction because it was foreseeable that their activity directed towards Texas residents would subject them to Texas jurisdiction. In *TravelJungle*, we held that the foreign defendant, TravelJungle, purposefully availed itself of the privilege of conducting activity in Texas by accessing the American Airline's computer servers in Texas via the Internet even though TravelJungle claimed that it did not know where American's servers were located: "By deliberately directing its activity toward AA.com, TravelJungle should have been aware of the possibility that it would be haled into any forum where AA.com's servers were located." 212 S.W.3d at 841, 850, 851. Likewise, by deliberately directing their activity toward Gernsbacher and Zintgraff—whom they knew to be Texas residents—Appellants should have been aware of the possibility that they would be subject to Texas jurisdiction, even if they did not know where Gernsbacher and Zintgraff were at the precise moments that Appellants allegedly made misrepresentations during the telephonic board meetings.

The phrase "directing their activity" leads us to a key part of Appellants' argument. Appellants argue that the basis for jurisdiction asserted by Appellees is that Appellants "directed a tort" at the two Texas plaintiffs—a theory of

15

specific jurisdiction that the supreme court rejected in *Michiana*.  In *Michiana*, the supreme court noted that directed-a-tort jurisdiction—that is, jurisdiction based on where the effect of a defendant's tort is felt—causes several problems.  168 S.W.3d at 790.  First, it shifts the court's focus from the relationship among the *defendant*, the forum, and the litigation to the relationship among the *plaintiff*, the forum, and the litigation.  *Id*.  Second, it confuses the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits; in other words, it shifts the analysis from *contacts* to *culpability*.  *Id.* at 790–91.  Third, directed-a-tort jurisdiction shifts the focus from the defendant's contacts to the type of claim asserted by the plaintiff; for example, a defendant might be subject to jurisdiction by directing a tort at the forum but not be subject to jurisdiction for a contract claim arising from the same facts.  *Id.* at 791.  And finally—as we have already noted—the supreme court observed that changes in technology have made reliance on phone calls obsolete as proof of purposeful availment (though, as we have also noted, it did not hold that phone calls can *never* be proof of purposeful availment).  *Id.* Ultimately, the court rejected the notion that "specific jurisdiction turns on *whether a defendant's contacts were tortious* rather than the contacts themselves."  *Id.* at 792.  (emphasis added).

16

In this case, we have focused our jurisdictional analysis on Appellants' contacts with Texas, not whether those contacts were tortious. Thus, while Appellants' observation that the supreme court has rejected directed-a-tort jurisdiction is true, it does not unhinge our analysis.

In sum, we conclude that Appellants' participation in the telephonic board meetings satisfies the three key aspects of purposeful availment. *See IRA Res.*, 221 S.W.3d at 596; *Michiana*, 168 S.W.3d at 785. Appellants' participation in the board meetings was not the unilateral activity of another party or a third person; the meetings were purposeful rather than random, isolated, or fortuitous; and Appellants sought some benefit or advantage by availing themselves of Texas jurisdiction, namely, Gernsbacher's and Zintgraff's subscription to the New Notes. We therefore hold that the evidence is legally and factually sufficient to support the trial court's conclusion that Appellants availed themselves of the privilege of doing business in Texas.

### 2. Substantial Connection

But purposeful availment alone will not support an exercise of specific jurisdiction. *Moki Mac*, 221 S.W.3d at 579. For specific-jurisdiction purposes, purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contacts. *Id.* There must be a

substantial connection between the defendant's forum contacts and the operative facts of the litigation. *Id.* at 584.

In *Moki Mac*, the supreme court looked to the factual issues that it anticipated would be the primary focus at trial to determine whether the plaintiffs' misrepresentation claims arose from or related to Moki Mac's purposeful solicitation of Texas customers. *Id.* The "operative facts" of the plaintiff's suit in *Moki Mac* concerned a tour guide's conduct on a hiking expedition in Arizona and whether the guide exercised reasonable care in supervising the plaintiff's son, who died during the hike. *Id.* at 585. The court reasoned that it was the events on the trail and the guide's supervision of the hike that would be the focus of the trial and would serve as the overwhelming majority of the evidence presented at trial, not the representations by Moki Mac in its literature to the plaintiffs. *Id.* Only after thoroughly considering the manner in which the hike was conducted would the jury then assess the plaintiff's misrepresentation claim. *Id.* The court concluded that "[w]hatever connection there may be between Moki Mac's promotional materials sent to Texas and the operative facts that led to [the son's] death, we do not believe it is sufficiently direct to meet due-process concerns." *Id.*

Here, in contrast to *Moki Mac*, Appellants' contacts with Texas that show purposeful availment—the telephonic board meetings—are also the operative

18

facts of the litigation. The primary focus at trial will be on the alleged misrepresentations Appellants made during the board meetings. Unlike the misrepresentations in *Moki Mac*, which were tangential to the plaintiffs' core negligence claim, Appellants' misrepresentations in this case *are* the core of Appellees' claims. Appellants' liability, if any, arises directly from and relates to their contacts with Texas. We therefore hold that there is a substantial connection between Appellants' forum contacts and the operative facts of the litigation. *See id.* at 584.

Having concluded that Appellants purposefully availed themselves of the forum and that there is a substantial connection between their forum contacts and the operative facts of the litigation, we hold that the evidence was legally and factually sufficient to support the trial court's conclusion that Appellants have minimum contacts with Texas sufficient to allow the exercise of specific jurisdiction over them.

## C.    Fair Play and Substantial Justice

We now turn to whether the exercise of personal jurisdiction over Appellants comports with traditional notions of fair play and substantial justice. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991). In making this determination, we consider the following factors: (1) the burden on the defendants; (2) the interests of the

forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental, substantive social policies. *See id.* at 228; *see also Asahi Metal Indus. Co. v. Superior Court of Ca.*, 480 U.S. 102, 113–16, 107 S. Ct. 1026, 1033–34 (1987); *Burger King*, 471 U.S. at 477, 105 S. Ct. at 2184. Only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts in the forum state. *Guardian Royal*, 815 S.W.2d at 231; *see also Schlobohm*, 784 S.W.2d at 358.

Appellants contend that the burden of litigating in Texas is "simply too great to justify jurisdiction" because the individual Appellants live in Minnesota, Illinois, or Michigan and because Appellant Glencoe is a Delaware corporation with its headquarters in Illinois. Distance from the forum is generally not sufficient to defeat jurisdiction because the availability of "modern transportation and communication have made it less burdensome for a party sued to defend himself in a State where he engages in economic activity." *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S. Ct. 199, 201 (1957). Further, Texas has a manifest interest in providing its residents with a

20

convenient forum for redressing injuries inflicted by out-of-state actors. *See Burger King*, 471 U.S. at 479–82, 105 S. Ct. at 2185–87. Moreover, Appellees have chosen to file suit in Texas, and Gernsbacher and Zintgraff have an interest in obtaining convenient and effective relief in Texas, where they reside and where they once owned businesses that were acquired by SESC. Finally, because Appellants hail from several different states, there will be some degree of inconvenience on at least some of them regardless of where litigation proceeds.

Ultimately, Appellants have not identified any considerations that would render jurisdiction in Texas unreasonable or that provide them with a vested right not to be sued in Texas. *See Burger King*, 471 U.S. at 477, 105 S. Ct. at 2184–85. We therefore hold that the trial court's exercise of personal jurisdiction over Appellants would not offend traditional notions of fair play and substantial justice. *See Tempest Broad. Corp. v. Imlay*, 150 S.W.3d 861, 876 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Cartlidge v. Hernandez*, 9 S.W.3d 341, 350 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *Rowland & Rowland, P.C. v. Tex. Employers Indem. Co.*, 973 S.W.2d 432, 436 (Tex. App.—Austin 1998, no pet.).

**III.    Conclusion**

Because Appellants established minimum contacts with Texas sufficient to subject them to specific jurisdiction in a Texas court and because the exercise of such jurisdiction would not offend traditional notions of fair play and substantial justice, we overrule their second and third issues and, not having reached their first issue, we affirm the trial court's denial of their special appearances.

ANNE GARDNER
JUSTICE

PANEL:    GARDNER, WALKER, and MCCOY, JJ.

DELIVERED:  October 9, 2008

22