**AFFIRM; and Opinion Filed July 6, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-00798-CV

### MONEYGRAM INTERNATIONAL, INC., Appellant

### V.

### DEMETRI THEOFANOPOULOS, Appellee

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-13957**

## MEMORANDUM OPINION

Before Justices Lang-Miers[1], Evans, and Schenck
Opinion by Justice Lang-Miers

Appellant MoneyGram International, Inc. appeals from the trial court's order granting appellee Demetri Theofanopoulos's special appearance. We affirm.

### BACKGROUND

Appellant MoneyGram is a Delaware corporation with its principal place of business and headquarters in Dallas Texas. MoneyGram provides international money transfer services. Appellee Theofanopoulos is a citizen and resident of Greece. He is the managing director of Moneylink Societe Anonyme Intermediation and Provision of Money Transfer Services d/b/a

---

[1] Justice Elizabeth Lang-Miers was not present for oral argument but participated in the disposition of this appeal. Justice Molly Francis was present for oral argument but did not participate in the disposition of this appeal.

Moneylink S.A., which—through agreement with MoneyGram—provided MoneyGram's money transfer services in Greece.

In 2006, MoneyGram and Moneylink entered into an International Money Transfer Agreement, which Theofanopoulos signed as managing director for Moneylink.[2] As described by MoneyGram vice president Eric Dutcher in a declaration, "Moneylink was appointed MoneyGram's agent in Greece to perform electronic money transfer services, principally through a network of sub-representatives located in Greece." Under the Transfer Agreement, "Moneylink was to deposit trust funds into a bank account to be debited and credited by MoneyGram for the settlement of mutual payment obligations" and these "payments were to occur twice a week." Dutcher stated that Theofanopoulos "had full authority and control over Moneylink's operations[.]" The Transfer Agreement stated that it was governed by and was to be enforced in accordance with the law of England and Wales.

According to Dutcher, in 2012, Moneylink "consistently fell behind on payments" and, by December 5, 2012, Moneylink had accrued a debt of €889,656.81. Representatives of MoneyGram communicated by e-mail and telephone with Theofanopoulos about this debt. Theofanopoulos spoke with Larry Angelilli of MoneyGram by phone about the debt and bringing Moneylink's "accounts current[.]" Dutcher stated that Theofanopoulos acknowledged the debt and said that he could only pay MoneyGram €89,656.81, and that—"[a]fter additional communications between MoneyGram representatives in Texas and Theofanopoulos"— MoneyGram and Theofanopoulos, on behalf of Moneylink, entered into a Payment Plan Agreement. The Payment Plan Agreement provided for the payment of the remaining €800,000 in four installments beginning January 15, 2013 and ending April 15, 2013. Dutcher stated that

---

[2] A 2013 e-mail from Theofanopoulos indicates that MoneyGram and Moneylink had a business relationship beginning in 2000.

"[a]t no time during these communications with MoneyGram representatives in Texas did Theofanopoulos state that he had taken funds from the trust account for his own personal benefit."

Dutcher declared that, after signing the Payment Plan Agreement, €89,656.81 "was immediately paid" and the first installment of €200,000 was paid "shortly thereafter[,]" but that the remaining three installments totaling €600,000 were never paid, despite "Theofanopoulos repeatedly representing to MoneyGram—through phone conversations with individuals in Texas and e-mails directed to individuals in Texas—that the installments would be paid[.]"

Dutcher stated that MoneyGram's consultant, Deloitte Tax LLP, later informed MoneyGram that "Theofanopoulos had loaned himself €860,000 (interest free) from Moneylink's accounts."[3] According to Dutcher, in the several months prior to when Deloitte "uncovered the fraud," Theofanopoulos made oral and written representations to MoneyGram representatives in Texas that the money would be paid back and that the money was "being properly maintained in the trust accounts for the benefit of MoneyGram." Dutcher stated that "MoneyGram continued to attempt to find a solution with Theofanopoulos rather than terminate the relationship" and, between February and April 2013, "MoneyGram representatives from Texas began negotiating" a Dominion of Funds (DOF) Agreement with Theofanopoulos. Theofanopoulos and MoneyGram representatives in Texas negotiated by telephone and e-mail and, according to Dutcher, he sent

---

[3] On February 1, 2013, Deloitte reported the "outflow of €860K on 06/06/2012" to Theofanopoulos. In a February 15, 2013 Interim Update Communication concerning Project Greece to MoneyGram, Deloitte stated the following "Observations":

- Based on the Cash in Hand ledger for the period 01.01.2012 to 31.12.2012, there is an outflow of €860K on 06.06.2012 which was located as an accounting entry by crediting the Cash in Hand account and debiting the Sundry Debtors account and more specifically the owner Mr[.] Theofanopoulos. The description of the outflow based on the cash movement is 'withdrawal from CEO Theofanopoulos Dimitrios as an 'interest free loan' which is to be repaid in 48 installments starting from 1/9/2013."

- We were not provided with further explanations in relation to the above transaction. According to Mr. Theofanopoulos, the matter should be discussed directly between Money[G]ram and himself.

The report then stated "Implications":

- Based on the information available, we cannot assess the recoverability of this 'interest free loan' to Mr. Theofanopoulos by Moneylink. According to article 23a of the Law 2190/1920, such loans to the Management of a Societe Anonyme (such as Moneylink) are not allowed. The tax consequences of such a loan should also be analyzed.

drafts of and revisions to the proposed DOF Agreement to MoneyGram representatives in Texas. Dutcher stated that the DOF Agreement "was a means to ensure that further trust funds would not be misappropriated by Theofanopoulos and to safeguard against future debt and credit risk."[4] The DOF Agreement recognized that (1) "over three million Euro" was due by Moneylink to MoneyGram from Moneylink's "failure to perform its obligations arising from the" International Money Transfer Agreement and (2) the purpose of the agreement was to limit MoneyGram's "further credit risk" and "restrict the exposure of the Money[G]ram Trust Funds[.]" The agreement provided that it was governed by and shall be construed in accordance with the laws of Greece. Ultimately, MoneyGram terminated its "business relationship with Money[l]ink and Theofanopoulos."

MoneyGram sued Theofanopoulos alleging claims of fraud, fraud by nondisclosure or concealment, conversion, money had and received, and unjust enrichment.[5] Theofanopoulos filed a special appearance or, in the alternative, a motion to dismiss the suit for *forum non conveniens*. He argued that MoneyGram "**has not and cannot allege sufficient contacts, or other conduct with Texas to warrant the exercise of personal jurisdiction**."[6] He argued that he has not had contact with the state of Texas and whether he committed purposeful acts against MoneyGram is not the test under Texas law, and that the correct test is whether a defendant committed such acts in Texas. He argued that he is a citizen and resident of Greece, he is not a resident of Texas, he does not have any real property or other assets in the United States, he does not maintain an office, website, or "other point of contact" in the United States, and he is not individually a party to any agreements in the United States with any "persons or entities" in the United States. He attached a

---

[4] Dutcher contends that "Theofanopoulos admitted to loaning himself the money and promised repayment." But Dutcher in his affidavit and MoneyGram in its brief do not direct us to where this admission by Theofanopoulos is located in the record.

[5] MoneyGram served the petition on Theofanopoulos pursuant to the Hague Convention's international service of process protocol.

[6] All bolded language throughout this opinion is bold in the parties' briefs.

declaration in which he stated that he has never been to Texas for any business or personal reason and had not been in the United States since 1983, and his reasons for being in the United States had nothing to do with the allegations in this lawsuit. He declared that he had not engaged in conduct indicating his intent to serve the Texas market, he had not personally solicited business in Texas or with any persons or entities in Texas, and he had not entered into any agreements that expressly consented to jurisdiction in Texas.

As MoneyGram states on appeal, MoneyGram then "amended its petition to state more clearly the jurisdictional basis for the lawsuit." In its first amended petition, MoneyGram argued that the Texas trial court had personal jurisdiction over Theofanopoulos because:

- Theofanopoulos "has done business in Texas specifically related to these causes of action by (1) negotiating and entering into a business transaction and/or agreements with MoneyGram, a corporation headquartered in Texas; (2) conducting business with a corporation headquartered in Texas over the course of five years; (3) inducing MoneyGram to agree to a payment plan with Moneylink due to the accrual of debt that Moneylink owed to MoneyGram; and (4) agreeing to and then failing to make the required and promised payments to MoneyGram because—unbeknownst to MoneyGram—Defendant had purposefully and fraudulently diverted those debts and monies owed to MoneyGram to his personal bank account."

- MoneyGram's claims "arise from or are connected with purposeful acts committed by Defendant in Texas because (in addition to the foregoing business dealings), this suit is based on several misrepresentations and omissions of material facts made by Defendant directed to MoneyGram, a corporation with its headquarters and principal place of business in Dallas, Texas."

- Theofanopoulos "purposefully acted in Texas on matters related to this suit by intentionally misleading and omitting material facts to MoneyGram, which was known to him to be a corporation with its headquarters and principal place of business in Texas." Theofanopoulos "communicated those misrepresentations and omissions by electronic mail, phone calls, and a video conference with MoneyGram employees located in Texas" whom he knew were located in Texas. And he "was well aware" that MoneyGram is a corporation with its headquarters and principal place in Texas because he sent and received drafts of agreements with MoneyGram that had MoneyGram's Texas address on them.

–5–

- Theofanopoulos's "corporate-officer status" does not shield him from the court's jurisdiction because his "conduct was not done on behalf of his company, Moneylink, but was instead done in his individual capacity as he diverted money held in trust for MoneyGram to his personal bank accounts."

- The court also had jurisdiction based on section 17.042 of the civil practice and remedies code because "the Texas long-arm statute allows the exercise of personal jurisdiction over a defendant who 'commits a tort in whole or in part in this state.'"

MoneyGram then filed its Response to the Special Appearance, and included Dutcher's declaration. Theofanopoulos filed a reply in support of his special appearance in which he argued, among other arguments, that the alleged phone calls, e-mails, and video conference were not enough to establish minimum contacts.

The trial court held a hearing concerning the special appearance. Following the hearing, the court entered an order sustaining the special appearance and dismissing the suit, and later entered an amended order that clarified the prior order, sustained the special appearance, and dismissed the suit.[7] MoneyGram filed this appeal.

## APPLICABLE LAW AND STANDARD OF REVIEW

"Texas courts may exercise personal jurisdiction over a nonresident if '(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees.'" *Old Republic Nat'l Title Ins. Co. v. Bell*, No. 17-0245, 2018 WL 2449360, at *3 (Tex. June 1, 2018) (quoting *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013)). "The long-arm statute is satisfied by a defendant who 'commits a tort in whole or in part in this state.'" *Id.* (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(2)). "However, allegations that a tort was committed in Texas do not necessarily satisfy the United States Constitution." *Id.* The exercise of jurisdiction by a state comports with federal due process if the nonresident defendant has "minimum contacts" with the

---

[7] The court did not rule on Theofanopoulos's motion to dismiss for *forum non conveniens*.

state and the exercise of jurisdiction "'does not offend traditional notions of fair play and substantial justice.'" *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017) (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)).

Although a defendant's contacts with the forum may give rise to either general or specific jurisdiction, the issue in this case is "whether the nonresident defendant['s] alleged minimum contacts gave rise to specific jurisdiction[.]" *Id.* at 886. "[S]pecific jurisdiction exists when the cause of action arises from or is related to a defendant's purposeful activities in the state." *Old Republic*, 2018 WL 2449360, at *3; *see Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 67 (Tex. 2016) ("[S]pecific jurisdiction exists when the plaintiff's claims 'arise out of' or are 'related to' the defendant's contact with the forum."). "For a Texas court to exercise specific jurisdiction over a defendant, '(1) the defendant's contact with Texas must be purposeful, and (2) the cause of action must arise from those contacts.'" *Old Republic*, 2018 WL 2449360, at *3 (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 795 (Tex. 2005)). "Thus, when analyzing specific jurisdiction, we focus on the relationship between the forum, the defendant, and the litigation." *Id.*

The defendant's minimum contacts are established when the defendant "purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* (quoting *Retamco Oper., Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Retamco*, 278 S.W.3d at 338. "Three principles govern the purposeful-availment analysis: (1) 'only the defendant's contacts with the forum' are relevant, not the unilateral activity of another party or third person; (2) the defendant's acts must be 'purposeful' and not 'random, isolated or fortuitous'; and (3) the defendant 'must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction' such that it impliedly consents to suit there." *M&F*

*Worldwide*, 512 S.W.3d at 886 (quoting *Michiana*, 168 S.W.3d at 785). The minimum contacts analysis focuses on the "quality and nature of the defendant's contacts, rather than their number." *Searcy*, 496 S.W.3d at 67 (quoting *Retamco*, 278 S.W.3d at 339). In addition, in order for a nonresident defendant's forum contacts to support the exercise of specific jurisdiction, "the defendant's purposeful contacts must be substantially connected to the operative facts of the litigation or form the basis of the cause of action." *Old Republic*, 2018 WL 2449360, at *4; *see Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007). "The operative facts are those on which the trial will focus to prove the liability of the defendant who is challenging jurisdiction." *University of Alabama v. Suder Found.*, No. 05-16-00691-CV, 2017 WL 655948, at *4 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.) (quoting *Leonard v. Salinas Concrete, LP*, 470 S.W.3d 178, 188 (Tex. App.—Dallas 2015, no pet.)). Although generally "we analyze the defendant's contacts 'on a claim by claim basis' to determine whether each claim arises out of or is related to the defendant's minimum contacts[,]" *id.* (quoting *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016)), we need not analyze contacts on a claim-by-claim basis when—as in this case—all claims arise from the same forum contacts. *Moncrief*, 414 S.W.3d at 150–51.

Additionally, we review determinations of personal jurisdiction de novo. *M & F Worldwide*, 512 S.W.3d at 885. "When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by evidence." *Id.* (quoting *Moncrief*, 414 S.W.3d at 150). In a personal jurisdiction challenge, the plaintiff and the defendant bear shifting burdens of proof. *Old Republic*, 2018 WL 2449360, at *4. The plaintiff has the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of the Texas long-arm statute. *Id.* Once the plaintiff has done so, the burden shifts to the defendant to negate all bases of personal jurisdiction alleged by the plaintiff. *Id.* "One way the defendant can meet this burden to negate jurisdiction is by showing that 'even

–8–

if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction' or that 'the defendant's contacts with Texas fall short of purposeful availment.'" *Id.* (quoting *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010)); *see Michiana*, 168 S.W.3d at 791 (stating "[j]urisdiction cannot turn on" whether "a plaintiff merely alleges wrongdoing"). If the defendant negates all grounds for personal jurisdiction alleged by the plaintiff, the burden shifts back to the plaintiff to show that the court has personal jurisdiction over the defendant as a matter of law. *Voltaix, LLC v. Ajongwen*, 406 S.W.3d 235, 240 (Tex. App.—Dallas 2013, no pet.). "[W]e must not confuse 'the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits.'" *Old Republic*, 2018 WL 2449360, at *4 (quoting *Searcy*, 496 S.W.3d at 70).

### MINIMUM CONTACTS

In one issue on appeal, MoneyGram argues that the trial court erred in concluding that Theofanopoulos's contacts with Texas were insufficient to confer personal jurisdiction. It alleges that Theofanopolos attempted to defraud a Texas corporation "through repeated (and undisputed) communications directed at MoneyGram's representatives in Texas." It claims Theofanopoulos "intentionally directed misrepresentations and fraudulent conduct to the Texas representatives of a Texas corporation, and his liability arises from these forum contacts, which will be the focus of the trial." It also contends that Theofanopoulos's contacts with Texas "**are extensive**."

It argues that "**Theofanopoulos participated in phone calls, emails, and a video conference with Moneygram representatives in Texas to induce MoneyGram to continue its relationship with Theofanopoulos under false pretenses.**" It lists eleven "facts and contacts supporting jurisdiction" and contends that Theofanopoulos's potential liability arises from or relates to these forum contacts and that "they are the operative facts of the litigation and will be the focus of the trial." They include:

- "Theofanopoulos knowingly misrepresented information to MoneyGram representatives in Texas upon which MoneyGram now bases its claims[.]"

- Theofanopoulos "failed to disclose his personal loan" despite "having regular contact with MoneyGram representatives in Texas[.]"

- "Theofanopoulos negotiated, authorized, and signed the Payment Plan Agreement despite knowing that MoneyGram was not getting all material information[.]"

- "Theofanopoulos induced MoneyGram to enter into the Payment Plan Agreement—through phone calls and emails—despite knowing" that he had no intent to fulfill his promises under the agreement and that he had been simultaneously diverting funds owed to MoneyGram.

- "Theofanopoulos negotiated and entered into business transactions and/or agreements with Moneygram employees in Texas[.]"

- "Theofanopoulos conducted business with MoneyGram in Texas over the course of five years[.]"

- At the "time of the events made the basis of this lawsuit[,]" Theofanopoulos "engaged in continuous and systematic e-mail correspondence with MoneyGram employees located in Texas[.]"

- At the "time of the events made the basis of this lawsuit[,]" Theofanopoulos "engaged in continuous and systematic phone conversations with MoneyGram representatives located in Texas[.]"

- "Theofanopoulos sent several drafts and revisions of proposed agreements to MoneyGram in Texas[.]"

- "Theofanopoulos was well aware that he was dealing with a corporation whose headquarters and principal place of business are in Texas[.]"

- "Theofanopoulos participated in at least 35 e-mails, at least 11 phone calls, and at least 1 videoconference with MoneyGram representatives in Texas during the relevant time period."

In response, Theofanopoulos argues that these contacts do not establish personal jurisdiction. He stresses that "[o]nly the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person." *Ahrens & DeAngeli, P.L.L.C. v. Flinn*, 318 S.W.3d 474, 477 (Tex. App.—Dallas 2010, pet. denied). And that "minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number." *Searcy*, 496 S.W.3d at 74. In reply, MoneyGram argues that the communications do establish minimum

contacts because they involve "**reaching out to a long-term business partner in Texas to commit fraud.**"

MoneyGram contends Theofanopoulos "was aware that he was dealing with MoneyGram representatives in Texas" because he called the MoneyGram office on several occasions and several e–mails and agreements identified MoneyGram's address and contact information. He argues that "Theofanopoulos himself placed many calls to Texas[.]" The record includes requests for him to call the Dallas office and evidence that he called the Dallas area code.

MoneyGram also argues that the record shows that Theofanopoulos was also in "continuous contact with multiple MoneyGram representatives" who "work in Dallas, Texas, as evidenced by the address information identified on several of their emails[,]" including the chief executive officer, chief financial officer, and vice presidents of MoneyGram. According to MoneyGram, as stated in Dutcher's declaration and as evidence shows, Theofanopoulos was "well aware" that MoneyGram and its representatives were in Dallas.

We agree with Theofanopoulos that on this record the communications without more do not establish minimum contacts to support personal jurisdiction. "Even assuming that the phone calls, [e-mails, and video conference] were sufficiently connected to the claim, a proper minimum-contacts analysis looks to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there." *Old Republic*, 2018 WL 2449360, at *5. In addition, we have held, alleged "fraudulent or negligent misrepresentations made through electronic media do not establish specific jurisdiction." *KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 393 (Tex. App.—Dallas 2012, no pet.); *see Michiana*, 168 S.W.3d at 791 (involving tort, contract, and statutory claims and stating "changes in technology have made reliance on phone calls obsolete as proof of purposeful availment"). And as the supreme court concluded with respect to a Canadian entity in *Searcy* and based on the special appearance record, Theofanopoulos "had

no control over" where the executives of MoneyGram "happened to be located[,]" "did not desire to create an ongoing relationship with Texas, enjoy the benefits of our laws, or profit from our thriving economy." 496 S.W.3d at 62 (holding even "considering the extent of the communications" which were "voluminous" and "electronic[,]" a foreign entity "did not purposefully avail itself of Texas's jurisdiction" because its "contacts with Texas were too fortuitous and attenuated").[8]

We also conclude that the contractual relationship between the parties does not support personal jurisdiction. Theofanopoulos argues that the contracts do not establish minimum contacts because "merely contracting with a Texas entity is insufficient to show purposeful availment." *Ahrens*, 318 S.W.3d at 485. Theofanopoulos also contends that the terms of the contracts negate Texas jurisdiction because, when the contracts address jurisdiction, the governing law for the contract is in another jurisdiction than Texas, including England, Wales, and Greece. We agree. "Even a sustained contractual relationship with a Texas resident does not support the exercise of jurisdiction if the contract is centered around the nonresident's operations outside Texas." *Univ. of Alabama*, 2017 WL 655948, at *6 (internal quotation omitted). And designation of foreign forums "suggests that no local availment was intended." *Searcy*, 496 S.W.3d at 75 (quoting *Michiana*, 168 S.W.3d at 792).

But MoneyGram argues that it is not contending that the contracts between MoneyGram and Theofanopoulos's company create minimum contacts and is not relying on the contracts as the "operative contacts from which liability arises." It argues that instead it relies on

---

[8] MoneyGram argues that the facts in *Searcy* are not analogous to this case because the specific jurisdiction analysis in *Searcy* did not involve a fraud claim and the "phone calls there were part of a tortious interference claim involving a third party with a tenuous nexus to Texas, and not part of a larger fraudulent scheme with a Texas corporation." It argues that in neither *Searcy* nor *Ahrens* "was the nonresident defendant making affirmative misrepresentations to a Texas corporation, fraudulently inducing the execution of a contract, and furthering a deceptive scheme via that fraudulent inducement and subsequent communications" and, according to MoneyGram, "[t]hose facts" are "sufficient to establish minimum contacts." We disagree with MoneyGram's contention that the "specific jurisdiction analysis" in those cases does not apply. Yet we agree with MoneyGram's contention—that it notes *Searcy* and *Ahrens* recognized—that the "key" is that "jurisdiction depends on the facts and the nature of the contacts."

–12–

Theofanopoulos's **"fraudulent inducement of a single contract"**—the Payment Plan Agreement—**"to establish jurisdiction**[.]" MoneyGram contends that the "existence of the Payment Plan Agreement (which has no venue provision) is critical" but "even more" critical "are the facts leading up to its negotiation (including representations falsely made)" and the "subsequent deception" which form the "operative facts" of MoneyGram's fraud claim. To the extent that MoneyGram relies upon the "existence of the Payment Plan Agreement"—which MoneyGram argues is "critical"—to establish minimum contacts, we conclude that the Payment Plan Agreement "does not support the exercise of jurisdiction" because it is centered around Theofanopoulos's company's "operations outside Texas"—namely the payment of a debt by Theofanopoulos's company Moneylink—which operated in Greece—to MoneyGram. *See id.*

Second, MoneyGram argues that "**[g]iven the fraudulent nature of Theofanopoulos's contacts, his physical presence in Texas is not necessary to establish jurisdiction.**" It argues that "[i]t is irrelevant" that Theofanopoulos has never been to Texas and has not visited the United States in over thirty years and argues, quoting *Retamco*, that "[j]urisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state." 278 S.W.3d at 339 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). But *Retamco* is distinguishable because the supreme court concluded that a company "reached out and created a continuing relationship in Texas" when it took "assignment of Texas real property," although the company "may not have actually entered the state to purchase this real property." *Id.* And the supreme court quoted *Burger King*, 471 U.S. at 476, for the proposition that, "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."

MoneyGram argues that "these principles are particularly applicable" when a "nonresident defendant directs misrepresentations to Texas residents to perpetuate a fraud or induce a plaintiff to enter into further agreements." To support its argument, it discusses three cases: *J.D. Fields & Co. v. W.H. Streit, Inc.*, 21 S.W.3d 599, 601, 604–05 (Tex. App.—Houston [1st Dist.] 2000, no pet.), *Norstrud v. Cicur*, No. 02-14-00364-CV, 2015 WL 4878716, at *8–9 (Tex. App.—Fort Worth Aug. 13, 2015, no pet.) (mem. op), and *Glencoe Capital Partners II, L.P. v. Gernsbacher*, 269 S.W.3d 157, 166–67 (Tex. App.—Fort Worth 2008, no pet.). It contends that, like the defendants in these cases, Theofanopoulos's "continuous and systematic misrepresentations and omissions" to MoneyGram created sufficient contacts so that Theofanopoulos could "reasonably anticipate being hauled into a Texas court" as a result of "his fraudulent actions." But all three cases are distinguishable. *J.D. Fields* concerned jurisdiction over a party who "personally guaranteed the indebtedness of defendant company that was payable to Houston[.]" 21 S.W.3d at 605. In *Norstrud*, the court concluded that a company's chief financial officer who resided in Florida "purposefully targeted" investors "in Texas," "directed misinformation to them to secure their investment," and signed agreements that "contain[ed] clauses that either Texas law governs the agreement or that the agreement is performable in Texas," which "show[ed] the contemplation of a long-term relationship with Texas[.]" *Norstrud*, 2015 WL 4878716, at *3, 8–9. And *Glencoe* found that nonresident board members had minimum contacts with the state when, among other contacts, they allegedly "sought to induce Texas residents" to "subscribe to" corporate notes. 269 S.W.3d at 165.

MoneyGram also argues that, "more importantly," "Theofanopoulos's actions show a concerted course of conduct intended to deceive MoneyGram representatives in Texas and induce them" to enter into various agreements so that he could conceal his personal "loan" and avoid defaults under prior agreements. It argues that, like the defendant in *Fields*, Theofanopoulos

"called the Texas office to assure that monies owed would be paid" and to "induce a Texas company" to enter into further agreements. But, as noted, *Fields* involved additional jurisdictional facts, including a personal guarantor guaranteeing a debt payable in Texas. 21 S.W.3d at 605. And, as stated above, "a proper minimum-contacts analysis looks to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there." *Old Republic*, 2018 WL 2449360, at *5.

Additionally, MoneyGram argues that Theofanopoulos's contacts "**were purposeful, not fortuitous because they establish an ongoing relationship with Texas residents**."[9] It contends that Theofanopoulos's signature, revisions to agreements, and authorization "establish purposeful availment of the privilege of conducting activities in Texas." MoneyGram notes that, under *Retamco*, an out of state company with no physical ties to Texas that signs a contract out of state still has minimum contacts "when it is clear the company purposefully directed its activities towards Texas." 278 S.W.3d at 340; *see Burger King*, 471 U.S. at 473 (discussing "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state,'" quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950)). MoneyGram states that this Court has recognized that "a single contract may meet the purposeful availment standard where the agreement involves many contacts between the defendant and the forum over a period of time." *Tabacinic v. Frazier*, 372 S.W.3d 658, 666 (Tex. App.—Dallas 2012, no pet.). But *Tabacinic* is distinguishable: we concluded that a "contract for the purchase or assignment of Texas real property is such" a "single contract [that] may meet the purposeful availment standard[.]" *Id.* at 666–67.

---

[9] MoneyGram refers to Theofanopoulos "planning his fraudulent scheme in Texas." As the record indicates, however, Theofanopoulos was not and has never been "in Texas."

–15–

In addition, MoneyGram argues that Texas courts have found purposeful availment "where nonresident defendants established an ongoing relationship with and obligations to Texas residents in order to profit from a business transaction with a Texas corporation." The three cases that MoneyGram points to as authority are again distinguishable. In *Carlile Bancshares, Inc. v. Armstrong*, No. 02-14-00014-CV, 2014 WL 3891658, at *12 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.), the plaintiffs pleaded that defendants "contracted by mail or otherwise with a Texas resident and either party is to perform the contracts in whole or in part in" Texas and the defendants concealed information in Texas during merger negotiations. In *Enright v. Asclepius Panacea, LLC*, No. 03-15-00348-CV, 2016 WL 1048881, at *6 (Tex. App.—Austin Mar. 8, 2016, no pet.) (mem. op.), among other facts, the defendant "traveled to Texas to meet with" the owner of the plaintiffs, "and they discussed the issues on which the fraud claims [were] based." And in *Barnhill v. Automated Shrimp Corp.*, 222 S.W.3d 756, 761, 763–64 (Tex. App.—Waco 2007, no pet.), the court concluded that the chief executive officer of a company that acquired the assets of another company "participated in founding a Texas corporation in which he owns stock" (as a result of the acquisition)—which resulted in him "maintain[ing] personal property in Texas"— "serves as 'Chairman & CEO,' performs services and reaps substantial benefits" including "$25,000 per month in compensation[.]" In contrast to these cases, the present case does not involve the purchase of property in Texas, the defendant's travel to Texas, or the defendant taking part in forming a Texas corporation and then owning shares of and receiving salary as an employee of that Texas corporation.

MoneyGram contends that "discussions and exchanges of information" concerning the Payment Plan Agreement "were not unilateral" and show that Theofanopoulos availed himself of the privilege of doing business "by negotiating with MoneyGram representatives in Texas." It also contends that Theofanopoulos "knew he was affiliating himself with a corporation

headquartered in Texas" for he "received several drafts of agreements from MoneyGram" and provided edits to the agreements and sent them to MoneyGram for review. It notes that, as in *Barnhill*, agreements here indicated MoneyGram's address and contact information in Texas.[10] But similar to the facts and holding in *M & F Worldwide Inc.*, 512 S.W.3d at 890, "[i]n negotiating, executing, and carrying out the" Payment Plan Agreement, Theofanopoulos "did not seek to do business in Texas, commit a tort in Texas, or allegedly cause injury to" MoneyGram "in Texas" —and as a result it did not "purposeful[ly] avail[]" itself "of the privilege of conducting activities within the forum state[.]"

As a further argument, MoneyGram contends that Theofanopoulos—through these contacts—"sought a financial benefit and profit in availing himself of the State of Texas." MoneyGram argues that, Texas courts have recognized that when a nonresident defendant "stood to reap financial benefits from a transaction with Texas residents through alleged fraud," the nonresident "consents to suit" in Texas. But the cases that MoneyGram cites are also distinguishable. *See Retamco*, 278 S.W.3d at 339 (company "reached out and created a continuing relationship in Texas" when it took "assignment of Texas real property"); *Enright*, 2016 WL 1048881, at *6 (defendant "traveled to Texas to meet with" the owner of the plaintiffs, "and they discussed the issues on which the fraud claims [were] based"); *Norstrud*, 2015 WL 4878716, at *3, 8–9 (corporate officer, among other actions, "purposely targeted" investors "in Texas" and signed agreements that "contain[ed] clauses that either Texas law governs the agreement or that the agreement is performable in Texas"); *Tabacinic*, 372 S.W.3d at 670–71 ("representations underlying the tort claims concerned activity relating to Texas real property, sold to Texas residents, to occur in Texas"); *Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 27 (Tex.

---

[10] Given our disposition, it is not necessary for us to address MoneyGram's argument that Theofanopoulos's contention that he has no "point of contact" in Texas "evades common sense."

App.—Houston [1st Dist.] 2010, no pet.) ("representation to plaintiffs in Texas" concerning "the ongoing operation of two Texas entities").

MoneyGram contends that the financial benefit and profit that Theofanopoulos received—through directing "misrepresentations and omissions to MoneyGram representatives in Texas"—included inducing MoneyGram to enter into the Payment Plan Agreement, preventing MoneyGram from acting against Theofanopoulos, including by terminating the business relationship, "reap[ing] benefits" of €860,000 "owed to MoneyGram[,]" and continuing to make misrepresentations "with the hope that MoneyGram would buy his business from him[.]" MoneyGram argues that—"[f]ar from seeking to avoid Texas"—Theofanopoulos "sought out Texas to engage in a fraudulent scheme to financially benefit his own self." But the evidence that MoneyGram cites does not reflect that Theofanopoulos "sought out Texas" for financial benefit and profit. *See Michiana*, 168 S.W.3d at 788 (stating "'financial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that State'" (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980)).

Lastly, MoneyGram argues that Theofanopoulos "has not negated any of the Texas contacts discussed above" but "simply declared that he is a nonresident of Texas." Without citing authority, MoneyGram argues that Theofanopoulos did not amend his special appearance to address the additional jurisdictional facts in MoneyGram's first amended petition. We conclude that Theofanopoulos negated "all bases of personal jurisdiction alleged by" MoneyGram. *See Old Republic*, 2018 WL 2449360, at *4 ("One way the defendant can meet this burden to negate jurisdiction is by showing that 'even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction' or that 'the defendant's contacts with Texas fall short of purposeful availment.'" (quoting *Kelly*, 301 S.W.3d at 659)).

Having concluded that the contacts that MoneyGram argues as a basis for personal jurisdiction do not constitute purposeful availment, it is not necessary for us to analyze whether these activities have a substantial connection to the operative facts of the litigation. *See WaterWorks Corral Creek, LLC v. AquaTech Saltwater Disposal LLC*, No. 03-16-00309-CV, 2018 WL 988907, at *11 (Tex. App.—Austin Feb. 21, 2018, pet. dism'd) (mem. op.) (citing *Moki Mac*, 221 S.W.3d at 579); *see also Retamco*, 278 S.W.3d at 338 (stating the two components of specific jurisdiction).

We conclude that MoneyGram has not established as a matter of law that MoneyGram's claims arise from or are connected with alleged purposeful acts committed by Theofanopoulos in Texas and alleged misrepresentations and alleged omissions of material facts made by Theofanopoulos directed to MoneyGram in Texas.[11] As a result, we conclude that the trial court did not err in granting Theofanopoulos's special appearance. We resolve Moneygram's sole issue against it. We affirm the order of the trial court granting Theofanopoulos's special appearance.

### CONCLUSION

We conclude that the trial court did not err by granting Theofanopoulos's special appearance. We affirm the trial court's order.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

170798F.P05

---

[11] Because of our conclusion, it is not necessary for us to reach Moneygram's argument that the trial court's exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. It is also not necessary for us to reach Theofanopoulos's arguments that he was acting as an officer of Moneylink and not individually, that MoneyGram solicited him "to acquire the money transfer business of Money[l]ink[,]" and that MoneyGram "unilaterally imposed" agreements—including the Payment Plan Agreement—onto Moneylink. *See* TEX. R. APP. P. 47.1.

–19–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MONEYGRAM INTERNATIONAL, INC., Appellant

No. 05-17-00798-CV     V.

DEMETRI THEOFANOPOULOS, Appellee

On Appeal from the 116th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-16-13957.
Opinion delivered by Justice Lang-Miers, Justices Evans and Schenck participating.

In accordance with this Court's opinion of this date, the order of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Demetri Theofanopoulos recover his costs of this appeal from appellant MoneyGram International, Inc.

Judgment entered this 6th day of July, 2018.